**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

———————————————————

**JOHN DOE,**

          **Plaintiff,**

    **v.**

**THE ADMINISTRATORS OF
THE TULANE EDUCATIONAL
FUND d/b/a TULANE UNIVERSITY,**

          **Defendant.**

———————————————————

**Civil Action No. _____**

**JUDGE:**

**MAGISTRATE:**

### COMPLAINT AND JURY DEMAND

Plaintiff John Doe[1] ("Plaintiff"), by his attorneys Nesenoff & Miltenberg, LLP and Marcelle Robertson Mestayer LLC, as and for his Complaint against Defendant, the Administrators of the Tulane Educational Fund d/b/a Tulane University ("the University" or "Tulane"), alleges as follows:

### THE NATURE OF THE ACTION

1.      This case arises out of the actions and omissions of Defendant Administrators of the Tulane Educational Fund, d/b/a Tulane University ("Tulane" or the "University"), and its agents and/or employees, in connection with biased and flawed disciplinary proceedings against Plaintiff, a former student at Tulane, and the sanctions Tulane wrongfully imposed on Plaintiff as a result of those biased and flawed proceedings.

———————————————————

[1] Plaintiff is filing a motion to proceed by pseudonym together with this pleading.

2.     In February 2022, Tulane students Sue Roe and Jane Doe[2] with whom Plaintiff had prior, consensual sexual relationships, filed false sexual misconduct reports against Plaintiff.

3.     Sue Roe and Jane Doe spent many hours together prior to filing their reports and each complainant had motive to fabricate allegations against Plaintiff, stemming from each woman's desire to have more than a casual relationship with Plaintiff. Jane Doe was described by a friend as seeking "revenge" against Plaintiff and changing her account of their sexual encounter after she learned that Plaintiff went home with another female student after his last encounter with Jane Doe.

4.     Jane Doe engaged in a false and defamatory smear campaign against Plaintiff, which resulted in threats to his physical safety, causing him to leave Tulane.

5.     Tulane, which had faced recent protests by female students for failing to adequately respond to male sexual predators on campus, and implemented policies and procedures grounded in the presumption that male students are toxic, aggressive, sexual predators, sprang to action to pursue an investigation against Plaintiff—even before he was informed that complaints had been filed against him.

6.     Tulane's conduct process against Plaintiff was flawed and biased from the start, as the Roe and Doe complaints were consolidated, in violation of Tulane's Code of Student Conduct, and assigned to a single investigator.

7.     Tulane also banned Plaintiff from campus and university-sponsored events and activities, without any basis for doing so and without following any policy or procedure then in effect.

---

[2] "Sue Roe" and "Jane Doe" are pseudonyms. Plaintiff will refer to other Tulane students involved in his disciplinary proceedings by their initials in order to protect their privacy and prevent the identification of Plaintiff, Sue Roe or Jane Doe. The persons identified by pseudonym and initial in this Complaint are known to Tulane.

8.     Tulane further promised Plaintiff a live hearing, as required by its Title IX policy and the federal Title IX regulations but then elected to investigate the Roe and Doe complaints under the process set forth in the Code of Student Conduct for complaints outside of Title IX, which employed a single investigator model. Under the Code, the investigator determined responsibility and sanctions.

9.     Tulane engaged in a sloppy, flawed, and biased investigation in which it selectively applied provisions of its Title IX Policy and the Title IX regulations in order to benefit the female complainants, while repeatedly denying Plaintiff rights afforded under the same.

10.     Tulane's investigator explained away inconsistencies, misrepresentations and omissions in the complainants' statements, fully crediting their accounts and the female witnesses' statements, while failing to credit Plaintiff's account *or any statements made by male witnesses*. This exemplified the investigator's failure to weigh the evidence, or properly apply the preponderance of the evidence standard required by Tulane's Code of Student Conduct.

11.     Improper, punitive inferences were drawn against Plaintiff, and the administrators involved in his student conduct process operated under a presumption of guilt, even though the objective evidence supported Plaintiff's assertions in his submissions to the investigator.

12.     By employing a gender-based presumption of Plaintiff's guilt and biased proceedings consistently favoring and affirming female students regardless of the objective evidence, Tulane engaged in anti-male discriminatory bias in violation of Title IX of the Education Amendments of 1972.

13.     Further, by violating its own policies and procedures, and depriving Plaintiff of a fair and impartial disciplinary process, Tulane breached its contract with Plaintiff, as stated in its

publications to Plaintiff, acted in bad faith and issued a disciplinary sanction of expulsion that was arbitrary and capricious.

14.     Accordingly, Plaintiff brings this action to obtain damages and injunctive relief for violations of Title IX and breach of contract.

## THE PARTIES

15.     Plaintiff is a natural person and a resident of South Carolina. During the events described herein, Plaintiff was enrolled as a full-time, tuition-paying undergraduate student at Tulane.

16.     Defendant The Administrators of the Tulane Educational Fund is a partially federally funded, non-profit educational corporation with a principal place of business at 6823 Saint Charles Avenue, New Orleans, Louisiana.

## JURISDICTION AND VENUE

17.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367, because respectively: (i) the federal law claim arises under the constitution and statutes of the United States; (ii) Plaintiff is a citizen of South Carolina and Defendant is a citizen of Louisiana and the amount in controversy exceeds $75,000; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

18.     This Court has personal jurisdiction over Tulane on the ground that it is conducting business within the State of Louisiana.

19.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and the University's principal place of business is in this district.

<u>**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**</u>

**I.**    <u>**Plaintiff's Background**</u>

20.  Plaintiff was accepted to, and enrolled at, Tulane in May 2018. He matriculated at Tulane in August 2018. Upon his expected graduation in May 2022, Plaintiff intended to pursue a Masters of Business Analytics at Tulane.

21.  During his time at Tulane, Plaintiff was heavily involved in the campus community and engaged in social and philanthropic activities. Plaintiff was a member of a fraternity and led a national service organization for two years. Plaintiff received several honors and awards and was on track to graduate *cum laude*.

22.  Plaintiff's plans were derailed on May 6, 2022 when, after subjecting Plaintiff to a flawed and gender-biased student conduct process, Tulane expelled Plaintiff and permanently marked his academic transcript.

**II.**    <u>**Tulane Vows to Stop Sexual Violence and Targets Male Students as Sexual Predators**</u>

23.    Prior to Tulane's wrongful expulsion of Plaintiff, the University had engaged in a years-long campaign to end sexual violence on campus, which was implemented from the top down and touched all aspects of campus life, including Tulane's student conduct policies and practices.

24.    Tulane's campaign, including Title IX educational programs and presentations, was grounded in the theory that most men possess stereotypically aggressive, harmful personality traits (*i.e.* "toxic masculinity") that cause them to rape women.

25.    Tulane's Title IX educational programs and presentations did not include similar programming for women which concerned female stereotypes and their impact on relationships and sexual behaviors.

5

26.     Tulane's administrators, including the President, the University's Title IX office and Office of Student Conduct, operated under the assumption that Tulane's "rape culture" needed to be eradicated.

27.     "Rape culture" is a term coined in the 1970s that is generally understood to describe the concept that society blames female victims of sexual assault and normalizes male sexual violence.

28.     On January 11, 2016, Tulane's President, Michael A. Fitts ("Fitts"), announced to the campus that Tulane had hired Meredith Smith ("Smith") as the University's first full time Title IX Coordinator, to "address gender issues and sexual assault."

29.     Smith – a published author and speaker on topics related to sexual violence against college women (who, according to her social media pages, wrote a book chapter in 2017 titled, *Addressing and Preventing Violence Against Women on College Campuses*)–oversaw the University's Title IX programming and policies.

30.     Smith was responsible for overseeing Tulane's prevention of, and response to, alleged sexual harassment and violence. Over time, her efforts earned her a promotion to the position of Assistant Provost for Title IX and Clery Compliance.

31.     Tulane's "Title IX at Tulane" Facebook page described Smith as helping to "create a support centered reporting process" leading to "the creation of policies and procedures to protect victims in our community."[3]

32.     In April 2016, it was announced that Tulane's Undergraduate Student Government tripled its budget for Tulane's "Sexual Aggression Peer Hotline" ("SAPHE"), which is defined as "dedicated to supporting survivors of sexual violence and addressing rape culture at Tulane"

---

[3] https://m.facebook.com/titleixtulane/photos/a.375543109477919/1464829443882608/?type=3.

and a group "working to dismantle rape culture on campus through workshops, events, and outreach." https://campushealth.tulane.edu/departments/student-organizations/saphe.

33.    In Summer 2016, Tulane assigned "Asking For It: The Alarming Rise of Rape Culture – and What We Can Do About It" by author and activist Kate Harding, as the reading project for all incoming students. The theme for the reading project was "Power."

34.    The rape culture narrative, and Ms. Harding's book, emphasize that those who report sexual violence *must* be supported and believed.

35.    On August 7, 2016, Tulane held a webinar for faculty, students and alumni about how to discuss Harding's book and rape culture. The webinar discussed the perpetuation of rape culture, including the idea that education around sexual assault should be about "how women can avoid rape, ***not how men can not rape***" and that people often have trouble "othering" rapists, as if they could not be "our brothers." The webinar included a slide showing silhouettes of male figures. The webinar is still available on Tulane's Campus Health YouTube channel. https://www.youtube.com/watch?v=JQX2IN-nFmQ (last visited on March 2, 2023).

36.    The webinar further discussed that rape culture is perpetuated by the media because "when rape is reported in the media the urge to remain balanced creates biases against women." As part of a discussion about police and university bias against sexual assault victims, one speaker urged viewers to simply believe that rape allegations are true. *See id.*

37.    In 2016, Harding also visited the Tulane campus to speak about rape culture and her book.

38.    On September 19, 2016, Smith gave a presentation concerning the University's Title IX disciplinary process which focused on the fact that 1 in 5 women will be sexually assaulted by the time they finish college, and remarked, "This is why we don't ignore what's

going on our college campuses." Campus Health, Investigation 101, "Shifting the Paradigm," https://www.youtube.com/watch?v=_-Y8had-FDw.

39.     Smith's presentation did not mention that, in 2014, the authors of the study from which the 1 in 5 statistic originated published an article in *Time* magazine called "Setting the Record Straight on '1 in 5'" in which they stated "the 1-in-5 statistic is *not* a nationally representative estimate of the prevalence of sexual assault." https://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/ (last visited on March 2, 2023).

40.     Smith's presentation described the University's Title IX process as sexual assault victims standing up and saying "you hurt me and you should be **held accountable** for that." "Shifting the Paradigm," at https://www.youtube.com/watch?v=_-Y8had-FDw.

41.     In September 2017, student advocates from SAPHE, and other Tulane representatives, attended the "A Call to Men" conference to learn about toxic masculinity. *See* https://taylor.tulane.edu/2017/09/call-men-next-generation-manhood/.

42.     In January 2018, Tulane published the results of a campus climate survey and announced a "Wave of Change" campaign to end sexual violence on Tulane's campus which President Fitts described as a "movement that will lead to real change" noting that "[f]ollowing years of work to acknowledge the problem of sexual violence in higher education" "[a]s a nation, we are in the midst of a cultural watershed."

43.     On January 30, 2018, President Fitts and Smith held a sexual assault town hall meeting to discuss the results of the campus climate survey. At the meeting, President Fitts said "[f]undamentally this is about **changing rape culture**." (emphasis added) *See* Hullabaloo, "Students press administration over release of sexual assault town hall results," Jan. 31, 2018,

8

*available at* https://tulanehullabaloo.com/?s=Title+IX+and+intrinsic+bias (last visited on March 2, 2023).

44.     In or around mid-2018, Tulane replaced Wave of Change with the "All In" campaign. As part of "All In," Tulane published a three-phase Sexual Violence Prevention Plan. The first point set forth in Phase I (Academic Year 2018-2019) was "focusing on ***men's*** education and engagement within the Greek system." *See* All In Initiatives, at https://allin.tulane.edu/prevention/prevention-plan (emphasis added).

45.     Phase II (Academic Year 2019-2020) included a men's mentoring program. *Id.*

46.     Tulane's Summer 2018 reading project for incoming first year students addressed sexual assault, and included a companion presentation during New Student Orientation that discussed the "intersection between sports culture, toxic masculinity and feminism." https://news.tulane.edu/news/reading-project-opens-dialogue-about-relationships-sexual-assault.

47.     In a letter to the campus published on October 26, 2018, President Fitts' ***first point*** about responding to sexual violence on campus was that Tulane "greatly increased [its] funding and focus on sexual assault prevention, care and response efforts. This includes hiring additional staff, such as an assistant director for fraternity life to promote men's education and engagement within the Greek system." *See* "We Are Taking Action," *available at* https://president.tulane.edu/view-from-gibson/we-are-taking-action.

48.     A 2018-2019 "Initiatives Update" report for All In, issued by the Division of Student Affairs and Campus Health, noted the success of "Masculinity, Health and Social Justice: Featuring the Men's Story Project," in which participants learned how "traditional notions of masculinity can be harmful to people of all genders" and "new activities to do with students to

generate conversation about masculinity and traditional gender roles." All-In 2018-2019 Report, *available at* https://allin.tulane.edu/2018-2019-Report.

49.     The 2018-2019 report further described an "Educational Initiative" called the MENtality Project pilot workshop series in which men were asked to change their definitions of masculinity, challenge traditional gender roles and intervene in "potentially harmful" situations involving sexual violence. All-In 2018-2019 Report, *available at* https://allin.tulane.edu/2018-2019-Report.

50.     According to the 2018-2019 report, the objectives of the MENtality program included:

        a.      reducing male attitudes that support physical and sexual violence;

        b.      increasing men's understanding of how gender and other factors influence power; and

        c.      increasing men's awareness about the existence of power in gender roles and how this is reflected in relationships, sex and hook-ups. *Id.*

51.     The MENtality program further aimed "to eliminate sexual violence through peer discussion and peer influence beyond the program" and "expand its reach over the coming years. *Id.*

52.     In February 2019, Tulane's All-In newsletter to the campus contained an article which discussed toxic masculinity and that challenging "harmful aspects of traditional masculinity can play a role in reducing rates of sexual and gender violence" because "toxic masculinity is linked to the perpetration of violence against women in heterosexual relationships." *See* https://allin.tulane.edu/newsletter-february-2019 (last visited on March 1, 2023).

53.     In September 2019, Tulane's All-In newsletter announced that SAPHE had become part of the Campus Health Department.

54.     According to Tulane's Director of Public Health Initiatives and Assessment, the MENtality project was "focused on prevention methods as a sexual violence initiative." An October 2019 article in Tulane's student newspaper stated that the MENtality project was the "first step in the creation of a new wave of male-centered programming" including Tulane hiring a "Mens Engagement Coordinator" to help with research and outreach. *See* "MENtality Project Promotes Healthy Masculinity," Hullabaloo, October 2, 2019, *available at* https://tulanehullabaloo.com/49498/news/mentality-project-promotes-healthy-masculinity/.

55.     According to the MENtality Project web page, the program was initially designed to target male students who belonged to fraternities and to expand from there as an ongoing campaign with no end date. FAQs, *available at* https://campushealth.tulane.edu/departments/well/focus-areas/sexual-violence-prevention/mentality-project.

56.     Noted on the Mentality Project website under "Healthy Masculinity 101" is that "men perpetrate the overwhelming majority of violent crimes." *Available at* https://campushealth.tulane.edu/departments/well/focus-areas/sexual-violence-prevention/mentality-project.

57.     Under a heading called "The Man Box," Tulane's MENtality web page states:

The man box refers to a box full of definitions of masculinity that can box men in and limit what they can and cannot do or feel. The way we are socialized to think about gender is that there is a right way and a wrong way to be a male or a female. No one is to blame –we've all been taught this. The box can negatively impact boys and men by forcing them to always be on guard and ready to "prove" their masculinity and manhood. The box also teaches boys that one way to have power is to taunt others for being feminine. These messages lay the foundation for patriarchy and sexism, as they create associations between femininity and inferiority.

*See* https://campushealth.tulane.edu/departments/well/focus-areas/sexual-violence-prevention/mentality-project.

11

58.    According to Tulane, the "Man Box" includes "No emotions (except anger)," "Dominating," "Powerful," "Women are objects," and "Women are property." "Manbox Rules" include "Always be in control." *Id.*

59.    Tulane's "The Well For Health Promotion" website listed "men's engagement" under Sexual Violence Prevention. *See* https://campushealth.tulane.edu/departments/well.

60.    On or about October 12, 2020, the MENtality Project held a webinar with Julia Broussard ("Broussard") who was in charge of Title IX programming, working under Smith. The topic of discussion was described as how the Title IX office's work "intersects with healthy masculinity and violence prevention." *See* https://www.youtube.com/watch?v=RmgkOdYTImY (last visited on March 2, 2023).

61.    During the webinar, Broussard described herself as raised by feminist parents and a person who viewed gender equality issues *through a feminist lens*.

62.    Before working at Tulane, Broussard worked primarily with women and children at a domestic violence/rape crisis center.

63.    Per Broussard, men who embrace more "stereotypical" gender roles are more likely to commit acts of intimate partner violence and sexual violence.

64.    Broussard also stated that *being a white, cisgender man "carries privilege"* and that men should speak up *when* their *male friends say things to "promote rape culture."*

65.    At the time she made these statements, Broussard was responsible for developing Title IX training materials and communications for the Tulane community.

66.    In July 2021, Smith left Tulane.

67.     Broussard replaced Smith as Tulane's Interim Assistant Provost for Title IX and held that position until July 1, 2022.

68.     Broussard worked with the Office of Student Conduct and oversaw the investigation of the fabricated sexual assault allegations against Plaintiff.

69.     On February 15, 2021, Dr. Chris Zacharda ("Zacharda"), Director of Student Conduct, was interviewed for the MENtality project to discuss "his experiences with masculinity and how it has played a role in his personal and professional life." https://www.youtube.com/watch?v=yBechLk9s6E. Zacharda made the following statements during the interview:

a.   "This probably isn't anything earth shattering, but, the kinds of cases that male students are involved or students that identify as male or cis male, they tend to be cases related to violence, aggression, anger – those are the cases that rise to the serious level of the office of student conduct for myself or my two investigators." *Id.*

b.   "One of the things that we have to do is understand the context. Not just what behavior happened, but there's very often why a behavior happened. Understanding that context, especially in the realm of masculinity, may help the educational process *or in my case help the investigator figure out why did the student make the choices they did, that in this case he did*…was that because they were influenced by a hypermasculine or toxic masculinity culture that they've learned from family members or older brothers." *Id.* (emphasis added).

c.   "Making sure that when I am working with male students or male-identified students, I can understand the greater context that may have included issues of masculinity, issues of culture, as they are influencing the decisions that they are making so that the student and I can create a better path forward. In order for us to figure out what's next, we have to figure out how we got here and I think that where we really start to look at and explore how have issues of masculinity have impacted those choices." *Id.*

70.     According to Zacharda's statements, Tulane's Office of Student Conduct and its investigators have a gender-biased view about male students who are involved in the disciplinary

process. In addition, the investigators may consider stereotypes about masculinity when investigating or deciding student conduct cases.

71.     On January 20, 2022, Zacharda attended a Clery Act training which discussed "Myths and Facts About Acquaintance Sexual Assault" and focused on male perpetrators. A handout from the training includes the following statements:

a.  ***"MYTH: Women lie about being raped to protect their reputations, or to get revenge on a guy."***

b.  "MYTH: Once a male is aroused or excited, he has to have sex. He will not be able to stop himself."

    "FACT: There is a difference between not wanting to stop and not being physically able; people are physically capable of controlling their sexual actions."

c.  ***"FACT: Most rapes are carefully planned by the rapist. A rapist will rape again and again, usually in the same town (or within the same college or university) and in the same way."***

72.     On March 30, 2022, members of Tulane's Title IX office participated in a webinar "Using Technology to Engage Boys and Men In Sexual Assault Prevention," which focused on targeted education for male students. The webinar focused on men as perpetrators of sexual assault. https://tulane.app.box.com/v/titleixtraining/file/965995624197.

**III.     Students Protest Tulane's Perceived Failure to Expel Male Student "Rapists"**

73.     Tulane's Summer 2021 reading project for sophomores was to read *Know My Name* by Chanel Miller, a memoir about the author's personal experience with sexual assault.

74.     In Fall 2021, Tulane's undergraduate population was 7,780. 61% of those undergraduate students were women and 39% of those undergraduate students were men.

75.     In September 2021, there was a backlash against Tulane administrators for "glossing over campus rape culture" via the assignment of *Know My Name* without a trigger warning.

76.     An opinion piece in the student newspaper about the reading project criticized Tulane for failing to take an aggressive stance against those accused of sexual misconduct in order to hold them accountable, referencing the impact on female students. "Tulane's Summer Reading Choice Glosses Over Campus Rape Culture," Tulane Hullabaloo, at https://tulanehullabaloo.com/57222/views/opinion-tulanes-summer-reading-choice-glosses-over-campus-rape-culture/.

77.     In October 2021, Tulane's student newspaper reported on "@boysbeware.tulane," an Instagram account in which female and nonbinary students could anonymously post "stories about sexual abuse" and "warn one another about assaulters." "@boysebeware.tulane Illuminates Deep Rooted Sexual Abuse Culture," Tulane Hullabaloo, https://tulanehullabaloo.com/57720/views/opinion-boysbeware-tulane-illuminates-deep-rooted-sexual-abuse-culture/ (last visited on March 2, 2023).

78.     The article dismissed concerns about false accusations as "built upon patriarchal principles" and criticized Tulane as failing to protect female students from sexual assault. *Id.*

79.     The article justified the creation of the Instagram account as necessary in the wake of the 2020 Title IX Regulations, which "prioritize the rights of a sexual abuser over those of their victim and are disgustingly disrespectful to victims of sexual abuse." *Id.*

80.     The article further noted "Without a complete overhaul of the way that administrators both listen to survivors and punish assailants, the frequency with which women experience sexual assault will never change." *Id.*

81.     The "@boysbeware.tulane" Instagram account was deleted in November 2021. "Expel Rapists: Survivors Testify to Sexual Violence At Tulane," Tulane Hullabaloo, https://tulanehullabaloo.com/58213/news/sexual-violence/ (last visited on March 2, 2023).

82.     Immediately thereafter, a group called "Vigilante Justice" published an unverified list of men who were alleged sexual assault assailants. The list was subsequently taken down. *Id.*

83.     Shortly thereafter, more than 500 students, predominantly female, staged an "Expel Rapists" protest. The group planned to put together a list of demands to hold "perpetrators and the university accountable." *Id.*

84.     Broussard responded to the protest, stating that she "hopes survivors will be able to find other outlets to share their stories that are healing and empowering after the loss of @boysbeware.tulane" and she hopes "this presents an opportunity for … the offices involved in Tulane's response to sexual misconduct to receive feedback from students about those policies, processes, and resources." *Id.*

85.     On December 7, 2021, Tulane administrators held an "hours-long" listening session with sexual assault survivors. Among the topics addressed was Tulane's failure to "hold the repeatedly accused accountable." "USG Sexual Assault Meeting Posed Difficult Questions For Administrators," Tulane Hullabaloo, https://tulanehullabaloo.com/58474/news/usg-sexual-assault-meeting-posed-difficult-questions-for-administrators/ (last visited on March 2, 2023).

86.     On February 1, 2022, Tulane held a town hall to discuss the University's efforts to combat sexual aggression and violence on campus. Broussard, was a panelist at the event. "Amidst Climate Survey, USG Sexual Violence Committee Holds Town Hall, Tulane Hullabaloo," https://tulanehullabaloo.com/59060/news/amidst-climate-survey-usg-sexual-violence-committee-holds-town-hall/ (last visited on March 2, 2023).

87.     President Fitts spoke at the Town Hall, stating that survivors are "heard, **believed** and valued." *Id.* (emphasis added). Fitts referenced Tulane's campus wide sexual misconduct climate survey that was released on January 28, 2022, noting the survey would allow Tulane to "know better and do better." *Id.*

88.     These events, and the resulting pressure on Tulane to aggressively discipline male students accused of sexual misconduct immediately preceded the filing of false sexual misconduct allegations against Plaintiff.

## IV.     The Office for Civil Rights Pressures Universities to Aggressively Pursue Sexual Misconduct Complaints

89.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

90.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

91.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

92.     The DCL, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy and "minimize the burden on the complainant."

93.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A"), which was aimed at addressing campus sexual misconduct policies and

advised schools to adopt a "trauma-informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." 2014 Q&A, at 31, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

94.     In addition, the 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. *Id.* at 25-31.

95.     In the same month that the OCR issued its April 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

96.     In 2014, then-Assistant Secretary of Education Catherine Lhamon visited Tulane for a "campus convening." https://allin.tulane.edu/newsletter-september-2019.

97.     In June 2014, Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office For Civil Rights, U.S. Department Of Education (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

98.     The DCL and OCR put considerable pressure on universities to treat those accused of sexual misconduct—especially men—with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014.

## V.     The OCR Rescinds the Dear Colleague Letter and Adopts Enhanced Due Process Protections

99.     On September 22, 2017, the OCR formally rescinded the DCL and the 2014 Q&A, and put in place interim guidance (the "2017 Q&A") while the OCR reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. *See also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

100.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and ***are in no way required by Title IX law or regulation*****.**" Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

101.     As former Secretary of Education Betsy Devos noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due

process rights to better serve the 'victim' only creates more victims." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017).

104. On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." *Secretary DeVos: Proposed Title IX Rule Provides Clarity for Schools, Support for Survivors, and Due Process Rights for All* (Nov. 16, 2018, 9:41 a.m.) https://content.govdelivery.com/accounts/USED/bulletins/21bcf5b.

105. In the interest of being seen as protecting, supporting and believing female students, Tulane *openly opposed and resisted* the new guidance and proposed changes to the Title IX regulations that were intended to restore due process to campus proceedings and remedy the pervasive problem of universities railroading accused men.

106. Despite the different direction that OCR was taking to provide equal procedural protections to accuser and accused, Tulane continued to utilize victim-centered practices and policies, holding on, as a matter of ideological commitment, to what is a gender-biased enforcement of Title IX.

107. Not only are Tulane's practices victim-centered, they are premised on the theory that men rape women and that the majority of male students exhibit masculine traits that are toxic and harmful to women and others.

108. In February 2019, Tulane's magazine, "The Crescent," published the article "Restoring Power to the Accused: How Title IX Policy Changes May Affect Tulane Students." https://tulanemagazine.com/restoring-power-to-the-accused-how-title-ix-policy-changes-may-effect-tulane-students/ (last visited on March 2, 2023).

109. In the article, Smith spoke out against heightened due process protections for the accused, such as the right to cross examine complainants, noting "I absolutely believe this will

have a negative impact on reporting … because reporting students don't want to be cross-examined by attorneys…. We are trying to gather information, not put students on trial." *Id.* Smith's focus on reporting, *i.e.* survivors, completely ignored the severity of the ramifications of a lack of due processed for the accused.

110.    On May 6, 2020, the United States Department of Education released Title IX Regulations, which carried the force and effect of law as of August 14, 2020. "US Department of Education    Releases    Final    Title    IX    Rule,"    *available    at* https://www2.ed.gov/about/offices/list/ocr/newsroom.html.

111.    The Title IX Regulations provided respondents specific procedural rights, including without limitation: (i) a presumption of innocence until a finding of responsibility is made at the conclusion of the process; (ii) the right to review evidence directly related to the allegations with at least ten (10) days to review and respond; (iii) the right to review an investigative report that fairly summarizes relevant evidence and a minimum of ten (10) days in which to respond to the investigative report; (iv) an assurance that Title IX personnel are free from conflicts of interest or bias; and (v) the right to a live hearing in which each party's advisor may ask the other party and any witnesses all relevant questions, including those challenging credibility, with such cross-examination to be conducted directly, orally, and in real time.  (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf) .

112.    In October 2020, Smith gave a presentation called "Shift Your Paradigm" at the "Action Collaborative on Preventing Sexual Harassment in Higher Education: 2020 Summit." https://vimeo.com/showcase/7711364/video/471561929.    Smith's    presentation    concerned "Centering Survivors in Reporting Policies." *Id.*

21

113.    During the presentation, Smith discussed the new Title IX regulations and Tulane's efforts to counter their "deleterious effects." Smith described the regulations as harmful to survivors. *Id.*

114.    Smith further noted that Title IX, "the law addressing systemic gender quality in education" was "diluted and reduced" by the new regulations such that it has "become clear that progress is no longer going to be externally motivated by the government. It's going to have to come from us." Smith noted that administrators should choose to "put what's right before we ask the question of will we get in trouble." *Id.*

115.    Despite being obligated to create a disciplinary system that affords accused students substantial due process rights in cases alleging sexual misconduct as defined by the Title IX regulations, Tulane chose to do "what's right" by splitting the process so that certain sexual assault complaints were adjudicated pursuant to the Code of Student Conduct and others were adjudicated pursuant to the "Federal Regulation Sexual Harassment Policy." *See* https://allin.tulane.edu/content/federal-title-ix-regulations-and-updates.

116.    Charging the Office of Student Conduct with the investigation and adjudication of sexual assault complaints was a clear effort by Tulane to ensure that male students accused of sexual misconduct were held "accountable" in a process that afforded few real due process protections to the accused, including being denied the right to a live hearing and the right to cross examine the accuser.

117.    In fact, Tulane's conduct process for students accused of sexual assault under the Code of Student Conduct follows a single investigator model, in which the investigator conducts the investigation, determines responsibility and determines the sanctions. 2021-2022 Code of

Student Conduct, Pt. VI.E. This model **is prohibited** by the Title IX Regulations. 34 CFR § 106.45(b)(7).

118.    Students and organizations accused of minor policy violations are afforded a hearing where they can put on live testimony. 2021-2022 Code of Student Conduct, Pt. VI.C-D.

119.    By splitting the process, Tulane knowingly and deliberately deprives students, such as Plaintiff, procedural rights and protections that are already in place and mandated for similar cases, for the apparent sole purpose of making it easier for Tulane to skip from accusation to guilt and sanctions.

120.    Tulane could have chosen to create a process with heightened due process protections for the adjudication of all sexual assault complaints. Instead, upon information and belief, Tulane pushed the majority of complaints through the student conduct process rather than the Title IX process.

121.    For example, a student newspaper article reported that from July 1, 2020 to June 30, 2021, thirty sexual misconduct cases underwent student conduct "hearings" while only nine were "formally resolved." *See* https://tulanehullabaloo.com/58213/news/sexual-violence/.

122.    Data collected by the Title IX Office for July 1, 2021 to June 30, 2022 showed that of the 331 cases reported, about half occurred off campus and less than one third occurred on campus. Broussard found it "interesting … that we see more of these taking place off campus rather than on campus." "Shifting the Paradigm shows sexual misconduct data," Tulane Hullabaloo       https://tulanehullabaloo.com/61524/news/shifting-the-paradigm-shows-sexual-misconduct-data/ (last visited on March 2, 2023).

## VI.    Tulane's "Survivor"-Centered Student Conduct Process and Policy

123.    In January 2020, the National Association of Student Personnel Administrators

("NASPA"), which has 15,000 members representing more than 1500 educational institutions, issued a study, *"Expanding the Frame: Institutional Responses to Students Accused of Sexual Misconduct."* (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct). The study, which was intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially found the opposite—that **widespread institutional bias against the accused** starts at the very inception of a complaint, prior to any investigation or adjudication. *Id.*

124.    In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." *Id.*

125.    While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are left to defend themselves "due to perceived pushback from members of the campus community who disagree with providing respondent services." *Id.*

126.    Upon information and belief, Tulane was a member of NASPA at the time the study was conducted. Tulane's staff, including the investigator in Plaintiff's conduct process, have taken Title IX trainings through NASPA.

127.    Like the majority of institutions in the NASPA study, Tulane has an entire

department of advocates dedicated to assisting alleged victims, and a twenty-four-hour hotline dedicated to "supporting survivors of sexual violence and addressing rape culture at Tulane." *See* Sexual Aggression Peer Hotline and Education (SAPHE), https://campushealth.tulane.edu/departments/student-organizations/saphe (last visited on March 1, 2023); Case Management and Victim Support Services ("CMVSS"), https://cmvss.tulane.edu/.

128.   While the "Respondent Support" section of Tulane's website directs those accused of sexual misconduct to the CMVSS website, there is no link to resources for the accused on the CMVSS site. "Respondent Support," https://allin.tulane.edu/respondent-support (last visited on March 1, 2023). In contrast, the CMVSS website contains a "Victim Support" section with numerous links. *See* https://cmvss.tulane.edu/. The "Respondent Support" section is directed at friends of the accused as opposed to offering support directly to the accused.

129.   Tulane provides "Information on Sexual Misconduct" to students which states, "Reporting an assault is a deeply personal choice that ***only a survivor can make***, but the Office of Student Conduct is one way of regaining some control, ***holding the perpetrator accountable*** for his or her actions, and taking a stand on your own and the community's behalf." *See* https://conduct.tulane.edu/students/information-victims (last visited on March 1, 2023) (emphasis added). This presumes that the accused is guilty.

130.   While Tulane refers to "his or her" when describing the "perpetrator," in practice, Tulane administrators operated under the assumption that men rape women and that their sexual aggression is caused by toxic masculinity.

131.   According to a Fall 2021 Title IX training for appeal panel members, the purpose of the Office of Student Conduct is to "cultivate personal growth and social responsibility by guiding students to understand the impact of their behavior and choices."

https://tulane.app.box.com/v/titleixtraining/file/940604213768. This is yet more evidence that Tulane's student conduct process begins with a presumption of guilt—including sexual assault complaints handled by the Office of Student Conduct.

132.    Tulane provides FAQs to students, which offer insight about how students who face the risk of suspension or expulsion should engage with the conduct process:

> The University's conduct system is designed to educate students and ensure the safety of the entire community. In preparation for your hearing, we suggest that you reflect on this incident keeping these goals in mind. In our experience, students who can demonstrate that they have engaged in this reflection and have learned from the incident often fare better in the conduct process.

https://conduct.tulane.edu/students/frequently-asked-questions-students.

133.    This presumes that the accused are guilty and pose a threat to community safety and, if they do not seek to be educated, or admit their guilt, the conduct process will be difficult for them. It further states that students facing severe sanctions will be afforded a hearing.

134.    In the FAQ's, Tulane advises that the parties tasked with determining sanctions consider whether the respondent has "demonstrated that you have learned from the incident or *accepted responsibility* for your behavior." *Id.* (emphasis added).

135.    This encourages and incentivizes innocent respondents to *take responsibility for acts that they did not commit* in the hope of receiving a lesser sanction.

136.    Tulane's Fall 2021 training for appellate board members further states that a decisionmaker can consider a student's "attitude" and "ability to demonstrate learning" when determining sanctions. https://tulane.app.box.com/v/titleixtraining/file/940604213768.

137.    Tulane's survivor-centered approach, which presumes the guilt of the accused, is reflected in an April 1, 2020, "Title IX at Tulane" Facebook Watch presentation that Zacharda

participated in with Smith, in which they discussed the Office of Student Conduct's approach to sexual misconduct complaints.[4]

138.   Zacharda, who determined the path for the conduct process against Plaintiff, is responsible for initiating the student conduct process in consultation with the Assistant Provost for Title IX compliance when a report is received that a student has been sexually assaulted. *Id.*

139.   Zacharda's comments during the presentation revealed his bias and inherent unfairness in the student conduct process, in which the accused are presumed guilty and in need of education and behavioral changes about their presumed misconduct. *Id.*

140.   Zacharda noted that, throughout the conduct process, the complainant is in control of the steps that are taken, including whether the complaint is resolved through alternative dispute resolution ("ADR") or goes to a formal conduct process. *Id.*

141.   Within the ADR context, Zacharda said that he and the complainant together draft "talking points" to educate the respondent and Zacharda and the respondent create an action plan for the respondent to remedy the behavior. *Id.*

142.   Zacharda simulated potential conversations with the respondent, "Maybe the respondent was like 'I had no idea I was engaging in this behavior'" or "Maybe this isn't who [the respondent] normally [is], but this is who you are or at least were under the influence of drugs or alcohol." Zacharda exclusively articulates scenarios wherein the respondent is culpable for the alleged incidents in question. Not once throughout the duration of the interview does Zacharda acknowledge that false or inaccurate complaints may be filed. *Id.*

143.   Zacharda further discussed the role of impact statements and their significance to the investigator when determining sanctions after a finding of responsibility. Zacharda noted

---

[4] https://m.facebook.com/titleixtulane/videos/its-wednesday-spotlight-and-were-having-a-chat-with-our-director-of-student-cond/219059192512870/?__so__=permalink&__rv__=related_videos&locale=zh_CN

that the complainant has the opportunity to tell the investigator how the case should be resolved and how the respondent should be held accountable. Smith had to remind Zacharda that respondents can also submit impact statements. *Id.*

144. When discussing sanctions, Zacharda said the sanctions need to "match what is going to have the ***most*** impact for the individual being accused, or the respondent." *Id.* (emphasis added). He made no mention of any consideration of the impact the sanction would have on the respondent's educational opportunities or life. *Id.*

145. Tulane's FAQs about the student conduct process reflect Tulane's nonchalant attitude about the ramifications that a finding of responsibility can have on a student's life, stating "Take a moment to breathe! Having a disciplinary record does not necessarily mean that you won't get into a graduate program of your choice."

146. With respect to getting into graduate schools, the website states "most schools review an applicant's conduct record for serious incidents or patterns of behavior." It continues "If you have been involved in a serious incident or have multiple conduct offenses… [i]t is likely to help your application if you can demonstrate that you learned from the experience and took steps to address any underlying problems that caused you to engage in the conduct at issue." https://conduct.tulane.edu/students/frequently-asked-questions-students.

## VII.   Plaintiff's Interactions With Sue Roe

147. Plaintiff and Sue Roe met in September of 2019.

148. The two engaged in a casual sexual relationship from September 2019 to December 2019.

149. Towards the end of the Fall 2019 semester, Sue Roe wanted a more committed relationship with Plaintiff. John heard from his friends M.G. and M.V. that Sue Roe had

expressed an interest in officially dating Plaintiff.

150.    Sue Roe invited Plaintiff on a walk, during which Plaintiff told Sue Roe he was not interested in dating. Sue Roe told Plaintiff that she was similarly okay with remaining uncommitted and casual, in contrast to what Sue Roe had told Plaintiff's friends.

151.    Plaintiff and Sue Roe had a few sexual encounters following that conversation, but eventually stopped seeing each other. Plaintiff was seeing other women during that time and seldom reached out to Sue Roe.

152.    In January 2020, Plaintiff and Sue Roe returned to campus and did not interact much. Plaintiff felt tension between him and Sue Roe whenever he said "hello" to her. Shortly thereafter, Plaintiff and Sue Roe each attended the same party, during which Sue Roe began to cry.

153.    In the following two semesters, Plaintiff and Sue Roe had very few interactions. However, Sue Roe made her negative feelings toward Plaintiff known to others.

154.    When Plaintiff's name was brought up in Sue Roe's presence, Sue Roe went out of her way to explicitly say she "hated" Plaintiff.

155.    In Spring 2021, Plaintiff and Sue Roe had a consensual sexual encounter. After that encounter, they did not interact further until August 2021.

156.    On August 22, 2021, Plaintiff and Sue Roe were downtown on Bourbon St. celebrating a mutual friend's birthday. Sue Roe came up to Plaintiff at the bar and asked him to buy her a drink, which she would later pay him back for through Venmo. Plaintiff and Sue Roe ended up spending time together at the party and leaving the bar together.

157.    On the ride back to campus, Plaintiff and Sue Roe talked about their past relationship. Sue Roe apologized for being harsh towards Plaintiff following the conclusion of

their relationship. Sue Roe further expressed the complicated emotions she was feeling. She explained that that evening, she had learned that a guy she was in a sexual relationship with, B.H., had started "dating" a different woman.

158.    When their Lyft ride approached Sue Roe's home, Plaintiff asked if he should have the car drop Sue Roe off, but Sue Roe invited Plaintiff into her home. The two went upstairs and engaged in consensual sex.

159.    Soon after, the two were talking in bed when Plaintiff made a comment to the effect of "we may regret that later" which, upon information and belief, Sue Roe interpreted to mean Plaintiff regretted having sex with her that evening. What Plaintiff meant by the comment was that they may regret complicating their friendship. However, Sue Roe sat up and began to cry.

160.    Plaintiff immediately apologized for his comment, explaining that what he said was not meant to be interpreted as anything against Sue Roe. Plaintiff felt that the complicated emotions Sue Roe mentioned earlier had resurfaced and suggested discussing the matter in the morning. Plaintiff then went to sleep.

161.    While Plaintiff was asleep, Sue Roe was apparently still upset over Plaintiff's comments and proceeded to wake up a housemate, D.E., who asked Plaintiff to leave. As Plaintiff was asleep, he was slow to respond to D.E.'s entrance into Sue Roe's room or comprehend why she was asking him to leave.

162.    According to D.E., Plaintiff "wasn't moving at first" when D.E. asked Plaintiff to leave. Plaintiff eventually got out of Sue Roe's bed and went home, texting Sue Roe that he left and to lock the door and wishing Roe a "good night."

## VIII.   Plaintiff's Interactions With Jane Doe

163.    On or about September 2021, Plaintiff and Jane Doe "matched" on Tinder. They did not communicate each other or meet in person until they ran into each other at concert on November 20, 2021.

164.    At the concert, Plaintiff and Jane Doe spoke briefly and exchanged phone numbers. Thereafter, they did not see or communicate with each other for more than two months.

165.    On January 27, 2022, Plaintiff and Jane Doe accidentally ran into each other at a bar near Tulane's campus. After talking at the bar for some time, they left together and went to Plaintiff's house, where they fell asleep but did not engage in sexual intercourse.

166.    In the morning, they kissed for several minutes before Jane Doe stated "You're not going to be able to just fuck me like these other Tulane girls," to which Plaintiff responded "That's perfectly fine with me." Soon thereafter, Plaintiff and Jane Doe said goodbye, and Jane Doe left.

167.    On January 28, 2022, Plaintiff invited Jane Doe to his fraternity's upcoming date party and Jane Doe accepted.

168.    After asking Jane Doe to the date party, Plaintiff hung out with his friends M.V. and K.R. Upon learning that Plaintiff invited Jane Doe to be his date, K.R. warned Plaintiff to be careful because of information she had heard about Jane Doe.

169.    K.R. had previously had a sexual relationship with H.W., who had recently been banned from campus for violating COVID-19 guidelines for a birthday party he threw. K.R. explained that H.W. had just ended his relationship with Jane Doe and started a relationship with K.R. right before being reported to the University for violating COVID-19 guidelines. H.W. and others involved in the situation had deduced that Jane Doe was the one who reported him,

31

presumably out of spite for breaking up with her.

170.    On January 29, 2022, Plaintiff and Jane Doe attended Plaintiff's fraternity date party. Plaintiff picked Jane Doe up in the late morning and brought her back to his house. After approximately an hour of hanging out with Plaintiff's friends, Plaintiff and Jane Doe went to Plaintiff's fraternity house, where he introduced Jane Doe as his date. Along with others attending the party, Plaintiff and Jane Doe boarded busses that transported the entire group to the Race Course.

171.    While walking through the crowded field level of the Race Course, Plaintiff and Jane Doe passed Sue Roe.

172.    Soon after, Plaintiff had a brief conversation with a member of another fraternity, "K.S." who exchanged hellos with Jane Doe. When K.S. left, Jane Doe told Plaintiff that K.S. had previously assaulted her by trapping her in a room and refusing to let her leave unless she had sex with him. Plaintiff expressed sympathy for what Jane Doe had allegedly experienced.

173.    Soon after sharing her story, Jane Doe asked Plaintiff "Is there anyone you're avoiding here?" Plaintiff didn't think much of that question at the time and responded "Yeah, the girl I probably would've asked had I not asked you."

174.    He was referring to a fellow student, D.K. Jane Doe and Plaintiff then found seats in the press box and talked about a range of topics, including family and friends. Plaintiff mentioned that his birthday was the following Wednesday and Jane Doe asked to take multiple photos with Plaintiff before they left the party.

175.    In total, the two spent four hours at the racetrack. Plaintiff and Jane Doe each consumed approximately two alcoholic drinks during those four hours, and Plaintiff also had one sip of a friend's flask that contained alcohol.

176.    Toward the end of the day, at approximately 5:30pm, Plaintiff and Jane Doe decided to take an Uber back from the racetrack. Plaintiff asked Jane Doe if she would like him to add a stop for her so that she could return home. Jane Doe declined, indicating that she preferred to return to Plaintiff's house together.

177.    Once they were at Plaintiff's house, they attempted to have sexual intercourse, but did not because Plaintiff was unable to get an erection. After trying to have sex, Jane Doe said it was alright because she was too drunk anyway. Plaintiff responded that it wasn't because he was drunk and that he actually was pretty sober.

178.    He found it odd that Jane Doe said she was drunk since he had been with her all day and they only had approximately two drinks each over the course of five hours. However, he chalked it up to her trying to be kind about his inability to perform sexually. At that point, they decided simply to take a nap and slept for almost two hours.

179.    When Plaintiff awoke, Jane Doe was already awake. They began kissing and engaged in consensual sexual intercourse, during which Jane Doe was an active and enthusiastic participant. Afterward, the two got dressed and Plaintiff walked Jane Doe back to her house at approximately 9:00pm.

180.    On the walk home, she talked about a silent disco party that her house hosted the night before, and they engaged in other friendly conversation. When they got to Jane Doe's house, she gave Plaintiff a tour of the house and alluded to his returning again in the near future. Jane Doe gave Plaintiff a kiss goodbye, and Plaintiff walked back to his house.

181.    In the early afternoon of February 2, 2022, Jane Doe texted Plaintiff to wish him a happy birthday and the two exchanged friendly text messages for much of the afternoon. That evening, Plaintiff went to two bars, with friends, to celebrate his birthday. At approximately

9:00pm, Plaintiff and his friends left the second bar and went to a friend's house to prepare for a scheduled fraternity event. Plaintiff and Jane Doe continued to exchange text messages, including a text from Jane Doe saying "we can celebrate later."

182.    Near the end of the fraternity event, at approximately 12:00 a.m., Plaintiff texted Jane Doe to see if she wanted to hang out. She responded "yes." Plaintiff took a Lyft to Jane Doe's house, intending to pick up Jane Doe and walk back to his house.

183.    When Plaintiff arrived at Jane Doe's house, she came outside and they walked together to his house. During their walk, they discussed the social events they each attended.

184.    At Plaintiff's house, they went to his bedroom and engaged in consensual sexual intercourse. Plaintiff wore a condom during the encounter and both went to sleep almost immediately after.

185.    Plaintiff and Jane Doe awoke the next morning to the sound of Jane Doe's alarm, which she had set on her phone. After engaging in several minutes of mutual kissing, Jane Doe said she had to go to work. Plaintiff offered to walk her home, an offer she initially rejected, but Plaintiff said it was the right thing to do. Jane Doe smiled at this sentiment.

186.    As they dressed, Plaintiff made a joking comment to the effect of "I'm happy I did better this time" in reference to his inability to engage in sexual intercourse during their previous encounter. Again, Jane Doe smiled in response. As they walked to Jane Doe's house, they talked in an easy and friendly manner.

187.    Jane Doe spoke about attending Montessori as a child when they passed a local Montessori school. At Jane Doe's house, they kissed goodbye and Jane Doe again wished Plaintiff a happy birthday. Plaintiff returned home.

188.    The following night, February 3rd, Plaintiff went to a bar with a few friends,

where he ran into a woman, "A.H", on whom he had a crush. He offered to buy her a drink and they started talking in the middle of the bar, a conversation lasting more than an hour. Plaintiff and A.H then left the bar together, returned to Plaintiff's house, and engaged in consensual sexual activity.

189.     Upon information and belief, Jane Doe saw Plaintiff talking to A.H. at the bar and heard that he and A.H. went home together.

## IX.     <u>Jane Doe's Smear Campaign Against Plaintiff</u>

190.     On February 4th, a day after seeing Plaintiff with A.H., Jane Doe reported to one of Plaintiff's friends, "T.R.," that Plaintiff engaged in nonconsensual sexual activity with her. Upon information and belief, this was Jane Doe's first instance of alleging such misconduct.

191.     By February 6th, false rumors had begun spreading around school alleging that Plaintiff had sexually assaulted a female student.

192.     On February 7th, Plaintiff's friend "T.G." told Plaintiff that people were talking about him in a negative way and that a fellow student, "A.S.," one of Sue Roe's best friends, had posted on her Instagram story a message to the effect of "Being friends with a sexual assaulter means you are part of the problem" with an indication that she was referring to Plaintiff.

193.     Plaintiff did not know what he was accused of doing and received no concrete information concerning the specific claims circulating about him.

194.     Plaintiff's friend, M.K., then showed him an Instagram post from Jane Doe that stated "Being drunk is not an excuse for Sexual Assault," which was posted at the same time and seemingly in conjunction with A.S.'s post.

195.     That night, fellow classmate, "S.B.," drove Plaintiff home from class. During the drive, she warned Plaintiff that Jane Doe was "crazy."

196.    Plaintiff then heard from another fellow student, "A.T.," that she was told by three different people that Plaintiff had assaulted a Tulane student. One of the students who shared this information with A.T. was abroad in Spain and had heard it from friends in a different Tulane fraternity.

197.    Plaintiff was shocked that this false information had made its way to students studying abroad, even prior to Plaintiff himself hearing about it. Plaintiff was unaware of the specifics of the false allegations and did not even know to whom the allegations pertained.

198.    On the evening of February 8th, Plaintiff received a text message from Jane Doe, falsely claiming Plaintiff engaged in sexually inappropriate behavior:

> After we had consensual sex on your birthday, I told you that I was tired and wanted to sleep. At first you said that was fine but then 10 minutes later you asked me to have sex again to which I responded no, that I was tired and didn't want to. You continued to ask me to have sex with you multiple times, each time with me saying no and asking you to go to sleep. I woke up to the sound of you jerking off and the feeling of you taking the blanket off my naked sleeping body and touching and squeezing it as you pleased. Even though I was paralyzed with fear and half asleep, I mumbled that I was cold and tried to pull the blanket back onto me. You then pulled the blanket off of me again and continued to pleasure yourself and touch me. You took advantage of my body in my most vulnerable state, and had no regard for how violating your actions were to me. You are a predator and a repeat offender, and will not manipulate or invalidate my assault, like you did to your previous victim. It blows my mind that you were able to manipulate people around you into staying friends with you but this time you will be held fully accountable or the trauma that you actions caused. You will be known for the disgusting coward you truly are. You need serious help, and honestly I don't care if you ever get it, but I do know that you will never have the opportunity to violate someone ever again.

199.    The text message shocked and scared Plaintiff. He recalled their two sexual encounters, which had occurred in the previous several days and knew he had not committed any of the acts that Jane Doe was claiming.

200.    The following day, Plaintiff met with multiple friends to discuss the rapidly spreading false claims about him. Two of his friends called Plaintiff's parents to tell them it was

not safe for him to be on the Tulane campus and that someone should come get him and bring him home to his parents' house.

201.     That evening, the president of Plaintiff's fraternity informed Plaintiff that Jane Doe had called him.

202.     That day, Plaintiff learned from two of his male friends that Jane Doe had approached a group of Plaintiff's female friends to share her false allegations of assault. Jane Doe specifically asked one of his friends, T.R., to help "spread this news like wildfire."

203.     A point of confusion for Plaintiff was that Jane Doe's text referenced a prior sexual experience with another woman. Plaintiff assumed, without knowing, that the woman to whom Jane Doe referred was Sue Roe.

204.     After last having consensual sex with Sue Roe, Plaintiff assumed he was asked to leave because of the comments he made that upset Sue Roe. When Plaintiff later reached out to Sue Roe by text message, Sue Roe responded and claimed she had D.E. ask Plaintiff to leave because he woke her up to try to get her to have sex again.

205.     Plaintiff knew that Sue Roe's text to him described events that simply never occurred, but he felt this may have been Sue Roe's way of excusing her active participation in the sexual encounter and pacifying her own feelings of guilt and regret. Plaintiff did not resist her characterization so as to preserve Sue Roe's feelings.

206.     In hindsight, Jane Doe's statement that Plaintiff was a repeat offender, coupled with Jane Doe's odd comment at the race track about whether there was anyone there that Plaintiff was avoiding, made Plaintiff suspect that Sue Roe and Jane Doe had been communicating all along.

207.     As early as February 7th, several of Plaintiff's friends stopped responding to his

texts and calls.

208.     On February 8th, hours after receiving Jane Doe's text message, Plaintiff learned that a friend had seen the text message Jane Doe sent Plaintiff. In fact, Plaintiff's friend had been provided with a screenshot of the text from yet another friend.

209.     It became clear that Jane Doe's false narrative was spreading rapidly among fellow Tulane Students.

210.     Upon information and belief, the screenshot of Jane Doe's text message to Plaintiff included the contact name she had inputted for Plaintiff's number. The contact name was "rapist," and therefore anyone who received the screenshot saw Plaintiff referred to as a rapist by Jane Doe.

211.     On February 10, 2022, Plaintiff was kicked out of his fraternity group chat. The fraternity president then sent a message referencing the claims against Plaintiff to the group chat, which Plaintiff learned from a friend who had taken a screenshot of the message. Plaintiff called the fraternity president, asking him to change or delete the defamatory message, which he refused to do.

212.     Plaintiff's mother flew to Louisiana that same day, February 10th, to support her son and help him gather his items so he could return home to a safe environment.

213.     Due to the mental anguish and heightened anxiety Plaintiff was experiencing as a result of the false accusations, Plaintiff withdrew from the University for the semester, as he had already completed enough credits the prior semester to graduate.

**X.**    **Tulane Initiates A Student Conduct Process Against Plaintiff**

    **A.**    **Tulane Commences A Biased, Consolidated Investigation Without Plaintiff's Knowledge**

214.    On February 16, 2022, Plaintiff received a "Notice of Procedural Review Meeting" from Zacharda, which identified a single case number and notified Plaintiff that "on or around September, 2021 and or around Sunday, February 6, 2022 you engaged in non-consensual sexual contact with two different female students at off-campus locations."

215.    Plaintiff was not provided with copies of the complaints, any reports or evidence prior to the Procedural Review Meeting.

216.    The Notice further stated "Based on the received information, you have been charged with Sexual Assault."

217.    Plaintiff was "charged" prior to speaking with anyone about the substance of the complaints or being asked to respond to same.

218.    The use of the word "charged" likened the conduct process to a criminal process even though Tulane applies a "preponderance of the evidence" standard in its student conduct cases. *See* 2021-2022 Code of Student Conduct, at p. 14.

219.    Per the Notice, Zacharda scheduled the Procedural Review Meeting for February 17, 2022 via Zoom. The purpose of the Procedural Review Meeting was "not an opportunity for [Plaintiff] to present [his] case" but only "a time to ask questions about the student conduct process and [his] rights."

220.    The Notice stated that a purpose of the Procedural Review Meeting was to notify Plaintiff of the "selected conduct staff…and determine if you have reason to believe they cannot be impartial."

221.    Unbeknownst to Plaintiff, ***prior to*** his Procedural Review Meeting:

a. On February 11, 2022, Zacharda conducted a *joint* Procedural Review with Jane Doe and Sue Roe;

b. Without Plaintiff's knowledge or giving him the opportunity to object, Zacharda—in consultation with Broussard—combined the investigation of Jane Doe's and Sue Roe's *unrelated* complaints, concerning alleged incidents that occurred months apart, so that they would be investigated by one person;

c. On February 11, 2022, Zacharda assigned Jacqueline Barber ("Barber") as the sole investigator of the two, separate complaints;

d. Zacharda permitted Barber to commence her investigation before Plaintiff had an opportunity to object to her appointment as the investigator in his case;

e. Zacharda permitted Barber interview Jane Doe and Sue Roe, which took place consecutively on February 15, 2022, *before* Plaintiff was notified that an investigation was taking place or Barber's identity was disclosed to him.

222.    Per Tulane's training materials from Fall 2021, the investigator takes statements from the complainant and respondent *after* the Procedural Review meeting takes place. https://tulane.app.box.com/v/titleixtraining/file/940604213768.

223.    The Title IX Regulations permit the consolidation of formal complaints only where the "allegations arise out of the *same* set of facts or circumstances." 34 CFR § 105.45(b)(4) (emphasis added).

224.    OCR defines the "same set of facts or circumstances" as when "multiple complainants' allegations are so intertwined that their allegations *directly relate to all the parties*." 85 Fed. Reg. 30436 (May 19, 2020) (emphasis added).

225.    The Roe and Doe complaints did not meet the requirements for consolidation under the Title IX Regulations.

226.    Tulane's 2021-2022 Code of Student Conduct states that evidence of a party's "character or reputation with respect to other sexual activity *is not relevant* and *will not be* considered as evidence." Tulane Code of Conduct 2021-2022, at p. 13 (emphasis added).

227.    The Code of Student Conduct further states that "a party's prior or subsequent

sexual activity is typically not relevant and will only be considered as evidence under limited circumstances." *Id.*

228.     One such circumstance is in the case of "pattern evidence" defined as "[e]vidence of an occurrence or occurrences of sexual or other relevant behavior so distinctive or so closely resembling a version of the facts so as to tend to prove a material fact." *Id.*

229.     The Roe and Doe complaints did not meet the definition of pattern evidence under the Code of Student Conduct and Zacharda should not have directed a joint investigation.

230.     In the April 1, 2020 Facebook Watch program he participated in with Smith, Zacharda exhibited a fundamental misunderstanding of pattern evidence, describing a pattern as "several same or similar reports" or a "history of cases" against a respondent. This does not meet the definition set forth in the Code of Student Conduct.

231.     Though Zacharda had already consolidated the Roe and Doe complaints and appointed Barber as investigator, he misrepresented to Plaintiff via email "[a]fter our meeting today, I ultimately determine if the case is going forward or not. If it is, then you receive a notice of investigation and charges with the names of all parties involved."

232.     Similarly, during Plaintiff's Procedural Review Meeting, Zacharda told Plaintiff that the case "***will be*** assigned" to Barber. At no point did Zacharda disclose that Plaintiff was already under investigation.

233.     On February 18, 2022, Zacharda sent a Notice of Investigation to Plaintiff that stated that Tulane "will be conducting" an investigation.

234.     The Notice of Investigation also stated that Barber was "assigned to this matter" and "if you have a concern that the investigator is potentially biased or has a conflict of interest, you must raise this issue with me prior to your scheduled interview."

235.    Zacharda misrepresented the state of the conduct process to Plaintiff, and deprived Plaintiff the opportunity to object to Barber as an investigator, because—unbeknownst to Plaintiff at the time—Zacharda had already determined that the case should go forward on a ***single track***, with a single investigator and allowed Barber to interview the complainants ***prior to*** Zacharda's meeting with Plaintiff.

236.    Zacharda also prejudiced the entire disciplinary process against Plaintiff by combining the Sue Roe and Jane Doe complaints into a single investigation, handled by a single investigator as opposed to directing the separate investigation of each complaint.

237.    Zacharda violated the Title IX Regulations, Tulane's Code of Student Conduct and Tulane's Title IX Policy by appointing a single investigator to the Roe and Doe complaints.

238.    On March 1, 2022, Plaintiff's advisor notified Zacharda that (i) the consolidation of the Roe and Doe complaints violated the Title IX Regulations and the Code of Student Conduct; and (ii) requested that Barber be replaced by two independent investigators to separately investigate each complaint.

239.    On March 7, 2022, Zacharda denied Plaintiff's request.

240.    Zacharda stated that the Title IX regulations did not apply to Plaintiff's case, yet cited Tulane's Title IX Policy as the basis for his decision to consolidate the Roe and Doe complaints as "arising out of the same facts or circumstances."

241.    Zacharda cherrypicked various Code provisions as opposed to following one, uniform process. Upon information and belief, he did this to benefit the female complainants over Plaintiff as a male respondent. Zacharda's bias is evidenced by his prior public statements, reflecting his presumption that male students accused of serious conduct violations are guilty, and the recent pressure that Tulane administrators were under as a result of female student protests to

42

expel "rapists" and repeat offenders.

242.     Zacharda's decision significantly increased the chances of an incorrect and biased outcome against Plaintiff because one complaint could be used to bolster the allegations of the other, even if there was no evidence to support the allegations or any finding of responsibility with respect thereto.

243.     The decision to conduct one investigation into the Roe and Doe complaints also biased the investigator, Barber, because she was provided with the details of two unrelated complaints against Plaintiff at the start of her investigation.

**B.  The False Allegations Against Plaintiff**

244.     During the course of the conduct process against him, Plaintiff learned that Jane Doe reported her false allegations to the SAPHE hotline on February 6, 2022, three days after Plaintiff had sex with someone other than Jane Doe.

245.     On February 6, 2022, CMVSS filed a report which referred to Jane Doe as a "victim" of sexual assault. Three days after Plaintiff had had sex with someone else, Jane Doe falsely claimed that she had woken up to a man "beating off on [her]."

246.     On February 11, 2022, Jane Doe and Sue Roe simultaneously submitted Title IX /Sexual Misconduct reports naming Plaintiff as the respondent.

247.     Sue Roe claimed that Plaintiff vaginally penetrated her with his fingers and masturbated as she got dressed.

248.     Jane Doe claimed that Plaintiff masturbated while touching her buttocks with his hands and penis.

249.     Both claims were unequivocally false.

**C.  Plaintiff Is Promised and Then Denied the Due Process Protections of Title IX**

250. Tulane's 2021-2022 Code of Student Conduct states "This Code of Student Conduct is meant to be in compliance with local, state and federal regulations, including 2020 Title IX requirements." *Id.* at p. 5.

251. The Notice of Procedural Review Meeting that Zacharda sent to Plaintiff stated that "[f]or allegations of ***Title IX violations***, you are permitted to have an advisor of your choice, including an attorney." (emphasis added).

252. Prior to the Procedural Review Meeting, Plaintiff submitted an advisor form to the Office of Student Conduct which named an attorney as his advisor.

253. The Notice of Procedural Review also provided Plaintiff with a link to "Investigation Procedural Protections" which included information about the ***right to a live hearing in Title IX cases*** and the right to appeal "***Title IX related allegations***" on the grounds of investigator or decisionmaker bias.

254. During the Procedural Review Meeting, Zacharda told Plaintiff that Barber, was a "trained ***Title IX*** investigator."

255. On February 18, 2022, Zacharda sent Plaintiff a "Notice of Investigation and Charges," which identified Sue Roe and Jane Doe.

256. The Notice of Investigation stated that Tulane would be conducting a "prompt, thorough and impartial investigation" of the allegations against Plaintiff "pursuant to the procedures detailed in the Student Code of Conduct" noting "Tulane's grievance process is compliant with applicable federal and state law, including the 2020 Title IX Regulations."

257. The Notice did not specify that Tulane was applying the "Major Matters" provision of the Code of Student Conduct rather than the Title IX Policy.

258. The grievance process for sexual assault complaints under Tulane's Code of

Student Conduct for "Major Matters" followed a single investigator model that is prohibited in cases that fall under the Title IX Regulations, in which Barber was responsible for i) investigating Roe and Doe complaints; ii) determining responsibility with respect thereto; **and** iii) deciding any sanctions.

259.   The Notice of Investigation "charged" Plaintiff with two counts of "Sexual Assault" and one count of "Lewd/Obscene Conduct."

260.   The Notice did not break out each "charge" by complainant or provide details about the specific conduct that was the basis for each charge.

261.   The Notice stated that "[t]he burden is on Tulane to gather evidence, investigate the allegations, summarize all relevant evidence in a final investigation report, and ***hold a hearing at which a final determination is made*** subject to appeal." (emphasis added). This statement summarized the procedures applicable under the Title IX Regulations and Tulane's Title IX Policy.

262.   After receiving the Notice of Procedural Review Meeting and Notice of Investigation, it was Plaintiff's understanding that his grievance process would follow the procedures set forth in the Title IX Regulations, that Tulane's Title IX Policy applied and, consequently, he would be afforded a live hearing with the right to cross examine Sue Roe and Jane Doe.

263.   On Monday, March 7, 2022, and only in response to objections raised by Plaintiff's advisor, Zacharda informed Plaintiff by email that "the 2020 Title IX regulations do not apply. Universities have been allowed to create a separate investigation and adjudication process for off campus matters, like this one."

264.   However, even though Zacharda's March 7 email stated that the Title IX

Regulations did not apply, he stated "if you want to come on campus to participate in person in the investigation *or hearing* process, we can help make arrangements for you to do so." (emphasis added).

265.    Plaintiff was not given the opportunity to object to Tulane's decision not to follow the Title IX Policy, even though said Policy gave him the right to do so.

266.    Tulane's Title IX Policy clearly states that the Title IX Coordinator is required to conduct a gatekeeping evaluation of reports of "potential sexual discrimination, harassment or violence" and determine whether such reports should be resolved in accordance with the Title IX Policy or "dismissed." 2021-2022 Code of Student Conduct, Appendix A, Pt. VII.

267.    If the Title IX Coordinator dismisses a complaint from the Title IX process, both complainant *and respondent* have a right to appeal the decision, within one week of receiving notice of the decision. Pt. VIII.

268.    Plaintiff was not notified that Broussard was conducting a gatekeeping evaluation of Sue Roe's and Jane Doe's complaints pursuant to the Title IX Policy, nor did he receive notice of any dismissal or right to appeal Broussard's decision.

**D.   Tulane Imposes "Campus Ban" In Violation Of Its Policy**

269.    Tulane's Code of Student Conduct contains a list of "Responses and Consequences," including "Emergency Measures." *Id.* at p. 31-32. Per the Code, "Emergency measures are temporary actions taken by the University to ensure equal access to its educational programs and activities to foster a more stable and safer environment during the process of reporting, investigation, and/ or adjudication." *Id.* at 31.

270.    According to the Code of Student Conduct, in cases in which sexual assault is alleged, the Title IX Coordinator is responsible for imposing "reasonable and appropriate

emergency measures when necessary to protect the safety of the parties or witnesses involved." *Id.* The Title IX Coordinator imposes these emergency measures in accordance with the "Emergency Removal" procedure set forth in the Title IX policy.

271.    Per Tulane's Title IX Policy:

An Emergency Removal requires that the University undertake an individualized safety and risk analysis and then determine if a removal is warranted due to an ***immediate threat*** to the physical health or safety of any student or other individual arising from the allegations of Sexual Harassment. This analysis will be conducted by the University's Behavioral Intervention Team with a final determination regarding removal made by a deputy Title IX Coordinator. The Respondent will be notified in writing as to the determination and reasoning for the removal decision. *Id.* at p. 51 (emphasis added).

272.    Tulane's Behavioral Intervention Team is housed within CMVSS, which primarily provides Title IX complainants with assistance. The Team's purpose is to track "'red flags' over time, detecting patterns, trends and disturbances in individual or group behavior." *See* https://cmvss.tulane.edu/behavioral-intervention.

273.    On February 18, 2022, before Plaintiff responded to the allegations against him, or submitted any evidence with respect thereto, Zacharda sent Plaintiff a letter which imposed a "campus ban" on Plaintiff. The campus ban barred Plaintiff from being on campus and from participating in "University-sponsored or recognized events or activities."

274.    The letter also stated that Plaintiff could "submit information that you believe would lead the University to amend the terms of this ***interim suspension*** letter, you may submit that information in writing…within 24 hours of this letter date." (emphasis added).

275.    In essence, only two days after he learned of the Roe and Doe complaints and on the same day he received the Notice of Investigation against him, Zacharda gave Plaintiff 24 hours to make a case as to why he should not be banned from campus.

276.    Tulane violated the Code of Student Conduct when imposing the campus ban

because it did not follow the procedures set forth in the Code for cases alleging sexual misconduct. *Id.* at pp. 31, 51.

277.    Zacharda's letter made no reference to Broussard's evaluation under the Title IX Policy, contained no reasoning for the decision to impose the campus ban, nor informed Plaintiff of his right to appeal the decision. *Id.* at p. 51.

278.    The campus ban was excessive and improper because there was no evidence that Plaintiff posed an "immediate threat" to any student.

279.    The Behavioral Intervention Unit would have had no "red flags" to track with respect to Plaintiff because he had no disciplinary record and no prior Title IX reports.

280.    The only "pattern" at issue was Zacharda's biased, mischaracterization of the unsubstantiated, jointly reported allegations of Sue Roe and Jane Doe which he improperly combined into a single investigation.

281.    Plaintiff had already withdrawn from Tulane at the time the campus ban was imposed, but, as a result of the ban, he was prohibited from participating in various clubs and charitable organizations with which he had been involved for the duration of his time at Tulane. He also lost a job that he had on campus.

282.    To the extent that Zacharda determined that a campus ban was necessary, the decision was, upon information and belief, biased towards Plaintiff as a male student because Zacharda has expressed the view that male students engage in violent or aggressive behavior due to the influences of toxic masculinity and Zacharda was trained that it's a "myth" that women lie about being raped.

283.    To the extent Broussard was involved in the decision to impose the campus ban as required by the Code of Student Conduct, Broussard had previously expressed bias towards male

students, in that she views gender equity through a "feminist lens," believes that men who embrace "stereotypical" gender roles are more likely to commit acts of sexual violence and, in Fall 2021, made statements that were supportive of the female students who accused male students of sexual misconduct on the @boysbeware Tulane account.

### E. Tulane Conducts A Flawed And Biased Investigation

284.   The Code of Student Conduct requires that "major matters" be handled by a "trained and impartial" investigator. 2021-2022 Code of Student Conduct, Pt. VI. E.

285.   Barber, a graduate of Tulane's School of Law and practicing attorney, lacked the necessary experience and training to act as an investigator in Plaintiff's case.

286.   According to her LinkedIn profile, Barber worked for Tulane as a "Student Conduct Investigator" for only seven months prior to her improper joint investigation of the sexual assault allegations against Plaintiff.

287.   Prior to working at Tulane, Barber was a tax attorney.

288.   Barber's litigation history in Westlaw characterizes her work as primarily involving contract law.

289.   Prior to investigating Plaintiff's case, Barber took a Title IX investigator training which discussed sexual assault using gender stereotypes. NASPA Track 3 Title IX Investigator Materials, Fall 2021, at https://tulane.app.box.com/v/titleixtraining/file/878489229467 (last visited on March 3, 2023).

290.   Barber's training materials included the faulty statistic that 1 in 5 college women experience sexual assault. *Id.* at p. 14, "Prevalence Data".

291.   Barber's training further stated that "A study showed that 63.3 percent of men at one university who self-reported acts qualifying as rape or attempted rape admitted to committing

repeat rapes." Barber Training, at p. 14, "Prevalence Data." This suggests that most male college students are serial rapists.

292.   Barber's training also states that "Seven out of ten rapes are committed to someone known to the victim; for most women victimized by attempted or completed rape, the perpetrator was a boyfriend [or] ex-boyfriend." Barber Training, at p. 14, "Prevalence Data." This focuses on women as victims and men as perpetrators.

293.   In discussing credibility determinations, Barber's training notes "Pay attention to inconsistencies but note that in cases of trauma inconsistencies can occur. Inconsistencies may not determine credibility or lack thereof." This gives investigators permission to ignore inconsistencies in statements made by accusers at the expense of the accused.

294.   Immediately prior to investigating the allegations against Plaintiff, Barber took a training on the "Neurobiology of Sexual Assault" which addressed the "brain-based experiences, behaviors, and memory characteristics" of victims of sexual assault. https://tulane.app.box.com/v/titleixtraining/file/837212297347.

295.   Barber took no similar training concerning the behaviors or memory characteristics of those accused of sexual assault, but did take an "accountability" training which, upon information and belief, concerned respondents in student conduct proceedings. https://tulane.app.box.com/v/titleixtraining/file/837212297347.

1. **Barber Presumed Plaintiff's Guilt**

296.   Tulane's Code of Student Conduct states in relation to "Major Matters:"

> *The mere fact that a situation is being referred for investigation does not indicate any determination of any transgression of any kind. The investigation process is exactly that-a neutral and fair investigation with no presumptions of wrongdoing.*

> *Id.*, at Pt. VI. A., at p. 8 (alteration in original).

297.    The manner in which Barber conducted the investigation interviews demonstrates that she was biased in favor of Jane Doe and Sue Roe and presumed that Plaintiff engaged in misconduct.

**a.  The Complainant Interviews**

298.    Before Plaintiff was even aware that Roe and Doe had made complaints against him, and before a formal investigation of their allegations was commenced, Barber interviewed Roe and Doe.

299.    Barber interviewed Jane Doe and Sue Roe consecutively, with an hour in between interviews, leaving open the possibility that the two would speak about the substance of Jane Doe's interview.

300.    Barber interviewed Jane Doe first, on February 16, 2022.

301.    Prior to beginning the recording of Doe's interview, Barber and Doe had an off the record conversation about Plaintiff.

302.    Barber's questioning of Doe was far from impartial, as she often agreed with Jane Doe that Plaintiff had engaged in various behaviors:

   a.  When Jane Doe (who had not accused Plaintiff of "rape") said that "raping while drunk is a crime" Barber responded, "this line of questioning has nothing to do with excusing behavior. I've seen situations where it really does make a difference [in] explaining *what happened*." (emphasis added).

   b.  "You described the next morning in a way that makes me think that you believe he knows *what he did* and that it was wrong." (emphasis added). Barber followed up with an example of "one way" Plaintiff "might have known" he did something wrong.

   c.  Barber told Doe the specific types of witnesses she would be interested in speaking with.

   d.  Barber asked Doe why she thought Plaintiff's conduct fell within the definition of sexual assault under the Code of Student Conduct.

e. Barber told Doe that it was "great" that, unlike Sue Roe, what happened to Jane Doe was not ignored by their peers.

f. Barber asked Jane Doe, "[i]s there anything else that I might not know to ask?"

g. When Doe made unsupported allegations against Plaintiff, and said that her narrative needs to be shared to "protect" other, unnamed people, Barber responded "Yeah, that makes sense."

h. After Doe said that she wanted her allegations to be "attached to [Plaintiff's] name" so he would not be able to go on to "his nice little comfy job that he had all lined up by mommy and daddy," Barber asked "Is there anything else that gives you the impression that this is a long-term pattern of behavior that I haven't heard about?"

i. Barber asked Jane Doe for her suggestions on how to further investigate Plaintiff.

303. Barber also failed to ask follow up questions about important facts relayed by Jane Doe:

a. According to Jane Doe, she was friends with Sue Roe's former roommate, "N.B." Barber did not ask questions about how long Doe had been friends with N.B. or whether Jane Doe had socialized or interacted with Roe prior to the time in which they filed reports against Plaintiff.

b. Jane Doe asserted that she "heard from random people that, apparently, [Plaintiff] knew that it was wrong what he did." Barber did not ask Jane Doe to identify who made such statements.

c. Jane Doe disclosed that she deleted her text messages with Plaintiff, except one in which she accused him of sexual misconduct. Barber asked no questions about this, simply taking Doe's word that they were deleted because she did not want to look at them.

d. Jane Doe said she realized that Plaintiff had done something wrong after talking with her friend about Sue Roe. Barber asked no questions about what was discussed.

e. Jane Doe said she spent hours with Roe and her friend "unpacking" what had happened. Barber did not ask her to specify what was discussed during that time or how long Jane Doe and Sue Roe spent together discussing their cases prior to making complaints to Tulane.

304.    The questions that were—and were not—asked of Jane Doe evidence Barber's bias from the start of the conduct process and her investigation of the allegations under a presumption of guilt and belief that Jane Doe was telling the truth.

305.    Barber interviewed Sue Roe On February 16, 2022, after she interviewed Jane Doe.

306.    Barber's questioning of Roe was far from impartial. Barber posed the following "question" to Roe, planting the idea that Plaintiff was in a "blackout" during their sexual encounter, when Barber had not yet spoken to Plaintiff:

> Can you tell me about the evening before you guys went back to your place? Specifically, I'm interested in *his* level of intoxication…I don't ask because being drunk excuses sexual assault, but it does give context and sometimes explains bizarre behavior. And also people's ability to recall things after the fact, sometimes respondents say, "Well, I don't remember that," but if I know that they were blackout drunk then that makes a little bit of a difference. Did you all have drinks? (emphasis added)

307.    Barber's "question" also presumed that Plaintiff had engaged in some form of misconduct.

308.    Barber failed to ask follow up questions when Sue Roe reported that Jane Doe came over to her house to discuss their allegations against Plaintiff. Barber did not ask when or for how long Jane Doe was there, or what was discussed.

309.    Barber asked Sue Roe and Jane Doe how they were feeling and what had been the most difficult part of their experiences. She did not ask Plaintiff similar questions.

310.    Prior to receiving any evidence or statements from Plaintiff, Barber told Plaintiff that Sue Roe and Jane Doe were "done with" the interviewing process.

b.  **The Witness Interviews**

311.    Barber had off the record conversations with witnesses before she started recording their interviews. For example, when she spoke with witness "N.B.," a mutual friend of Sue Roe and Jane Doe, Barber and N.B. spoke about Sue Roe before they started recording.

312.    When interviewing Jane Doe's roommate, "E.M.," Barber assured her that her questions were "not like a cross-examination or something."

313.    At numerous points in E.M.'s interview, Barber failed to ask follow up questions when E.M. made general statements about *Sue Roe's* case and evidence that Jane Doe provided to E.M. prior to her interview.

314.    For example, E.M. said that she read a text message exchange between Sue Roe and Plaintiff. Barber asked no questions about this.

315.    Barber asked E.M. to interpret how Jane Doe's allegations fell under the definitions of sexual misconduct set forth in the Code of Student Conduct.

316.    Barber did not ask male witnesses, including Plaintiff, for their views on whether the alleged conduct fell within the definitions in the Code of Student Conduct.

317.    Plaintiff informed Barber that a male witness he identified, "H.W," had been banned from campus after breaking up with Jane Doe because, after H.W. subsequently failed to invite Jane to his birthday party, Jane Doe filed a complaint against him for COVID violations related to that party. Barber failed to ask H.W. about this incident during his interview.

318.    Plaintiff informed Barber that female student, A.S., coordinated with Jane Doe to post defamatory messages about Plaintiff on Instagram. Barber did not ask A.S. about this issue.

2. **Jane Doe Coached Witnesses And Disclosed Confidential Documents**

319. During the investigation, it was clear to Barber that Jane Doe shared confidential documents with witnesses ahead of their interviews and coached them regarding what happened and what they should say in both the Jane Doe and Sue Roe cases.

320. H.W. told Barber that Jane Doe showed him a copy of her "actual statement to the school" and told him "This is my statement to the school. So I want you to know, this is how I want it to be told…if there's close friends or people, make them aware this is what happened."

321. In an interview with "K.R.," Barber asked for her "uncoached" answers.

322. K.R. submitted text messages to Barber with a narrative indicating that she had been coached, as she referenced the "second assault."

323. Text messages provided to Barber by K.R. show that before K.R. and witness T.R. were interviewed, Jane Doe sent them:

   a. copies of her Title IX report

   b. email messages with Zacharda

   c. a copy of *Plaintiff's* confidential Notice of Investigation. Notably the copy of the Notice that Plaintiff received did not include a "cc" line indicating that Doe had received a copy

324. Jane Doe also sent her Title IX report to witness N.B.

325. Jane Doe showed E.M. text messages between Plaintiff and Sue Roe prior to E.M.'s interview.

326. Nearly every witness heard Jane Doe's version of events, with respect to her complaint *and* Sue Roe's, before he or she was interviewed.

327.   E.M. noted in her interview with Barber that Jane Doe was out to get "revenge" on Plaintiff and started "going through … social repercussions" by spreading her version of what happened to Plaintiff's friend group and roommates, among other people.

328.   One witness informed Barber that she "spoke to" Jane Doe before supplementing her witness statement. A number of Roe's and Doe's friends amended their witness statements to fit Roe's and Doe's narrative of the timeline in which they connected.

329.   Barber made no effort to determine how greatly the witnesses named by Jane Doe and Sue Roe were influenced by the numerous discussions they had and documents they were shown prior to their interviews or prior to supplementing their statements.

**3.   The Biased Initial Investigation Report**

330.   On March 31, 2022—before Plaintiff had submitted any statements or evidence—Barber circulated a draft investigation report to the Plaintiff and the complainants for review.

331.   The draft report was reviewed by Broussard and Zacharda before it was distributed.

**a.   Inclusion of Prejudicial Information About Baseless TRO**

332.   The draft "investigative timeline" noted that on March 16, 2022, Jane Doe "filed a petition for protection from abuse in Orleans Parish District Court."

333.   Barber included this entry in her report even though she knew that Plaintiff was no longer in Louisiana, had been banned from campus and had no contact with Jane Doe.

334.   Jane Doe's petition, seeking a temporary restraining order ("TRO"), was premised on Jane Doe's allegation that Plaintiff was calling their mutual friends and "interrogating" them. In reality, Plaintiff was speaking with witnesses who volunteered to speak with him and gathering evidence for his case.

335.   Tulane sponsored Jane Doe's false and groundless petition by assisting her with preparing and filing the paperwork and providing Jane Doe with an advocate—who had no personal knowledge—to serve as a witness.

336.   In contrast, Plaintiff was offered no assistance in defending against the false petition. Instead, Barber listed it as evidence in her report.

337.   On March 22, 2022, T.R., who was a mutual friend of Plaintiff and Jane Doe and a witness in the case, told Barber that she had spoken with Plaintiff voluntarily by phone and he had asked her questions related to the investigation.

338.   Barber was, therefore, aware that Jane Doe's petition was baseless and included it in the investigation to bolster Jane Doe's case.

339.   Barber also took no action in response to Jane Doe's clear strategy of trying to prevent Plaintiff from gathering evidence about the case.

340.   Barber omitted from the report that Jane Doe's petition *was dismissed* on March 24, 2022.

341.   According to the Code of Student Conduct, Barber could have excluded all information concerning Jane Doe's baseless TRO from the report, because it was "irrelevant, immaterial [and] more prejudicial than probative." 2021-2022 Code of Student Conduct, Pt. VI. E. Barber's failure to omit this information from the report is indicative of her bias against Plaintiff as the male accused.

342.   Barber's failure to exclude the information about Jane Doe's TRO from the report is further evidence that Barber was acting under a presumption of guilt when conducting the investigation as opposed to being impartial, as promised in the Code of Student Conduct. *Id.*

343.    Barber's failure to question Jane Doe's motives after her filing of a TRO based on false allegations of harassment is indicative of bias in the investigation.

### b. Barber Finds "Undisputed" Facts Before Gathering Plaintiff's Evidence

344.    Per the Code of Student Conduct:

*At the conclusion of the investigation*, the investigator will prepare a written report that summarizes the information gathered, ***synthesizes the areas of agreement and disagreement among or between individuals***…with any supporting information or accounts, and includes an investigative finding regarding whether any rule has been violated. However, before the report is finalized, necessary individuals or organizations will be given the opportunity to review a draft of the investigation report. *Id.* at p. 14 (emphasis added).

345.    On March 31, 2022, before the conclusion of the investigation, and before Plaintiff submitted any statements, responded to Barber's written questions or provided evidence, Barber circulated the initial investigation report.

346.    The initial report detailed 39 "undisputed" material facts, as opposed to simply outlining areas of "agreement and disagreement." This indicates that Barber improperly followed the investigation report procedure set forth in Tulane's Title IX Policy, which Tulane elected not to apply in Plaintiff's case. Code of Student Conduct, "Title IX Grievance Procedures," at pp. 17, 57. The Code of Student Conduct required that the investigator merely outline areas of "agreement and disagreement" between the parties. *Id.*

347.    In the report, Barber fully credited Sue Roe's and Jane Doe's allegations against Plaintiff as "undisputed." The report did not even note that Barber anticipated that changes would be made after she gathered evidence from Plaintiff.

348.    Prior to Barber's issuance of the initial investigation report, Plaintiff notified Zacharda that he would not sit for an in-person interview because he was being deprived the right

to a live, Title IX hearing as he had been promised and Tulane had refused to bifurcate the two complaints against him.

349.    Plaintiff agreed to respond to written questions in order to participate in the investigation. Barber sent the written questions to Plaintiff on March 10, 2022, without any due date. Plaintiff told Barber that he intended to respond to the questions and provide evidence.

350.    Barber's draft report shows that, at the time she issued the draft investigation report, Plaintiff's responses to her written questions were pending. Barber was further aware that Jane Doe had filed for a TRO against Plaintiff during the same time period in which Plaintiff was working on collecting evidence and providing responses to Barber's questions.

351.    While the Code of Student Conduct permits Tulane to proceed with an investigation absent the participation of the respondent, it does not allow the investigator to draw conclusions against the party simply because they did not provide information to the investigator. *See* 2021-2022 Code of Student Conduct, Pt. VI. E. This is precisely what Barber did when crediting the complainants' accounts as undisputed, material facts.

352.    Notably, the Code of Student Conduct gives Tulane 180 days to conclude investigations and it was, accordingly, unnecessary for Barber to rush the investigation, particularly since Plaintiff was not attending classes or permitted on campus. *Id.*

353.    Barber's statements of "undisputed" fact show that she drew improper and incorrect conclusions about the Roe and Doe complaints from the inception of the investigation, without giving Plaintiff an opportunity to be heard, and penalized him for his perceived lack of participation.

354.     Even without Plaintiff's evidence, Barber's findings of "undisputed fact" with respect to Sue Roe's allegations were flawed because the evidence Barber had prior to March 31 showed *inter alia*:

    a.  Sue Roe gave different accounts of what happened to: i) Plaintiff via text message; ii) K.W.; iii) roommate D.E.; and iv) Jane Doe. None of the accounts referenced the alleged digital penetration.

    b.  Barber credited purported photographic evidence submitted by Sue Roe as "undisputed" even though, as Barber herself noted, the evidence in the photos could have resulted from Roe and Plaintiff having consensual sexual intercourse prior to the alleged incident. Roe further stated in her interview that she "assumed" that the evidence was a result of the alleged attempted digital penetration as opposed to her consensual sex with Plaintiff.

    c.  Barber credited the purported photographic evidence submitted by Sue Roe even though it did not have a timestamp or date stamp.

    d.  Barber cited D.E.'s statement regarding the photographic evidence. D.E. told Barber that she did not know how she came to learn about the photos and she was not even sure that she had seen them, suggesting that she had either been coached or learned about them immediately prior to Roe and Doe making their Title IX complaints. Whatever the case, D.E.'s statement lacked credibility and should not have been cited in support of an "undisputed" fact.

    e.  Barber's stated "facts" about the details of Roe's alleged sexual assault were attributed in part to statements made by D.E., but the "facts" do not appear in D.E.'s transcript. D.E. did not corroborate the specific details of the alleged assault.

    f.  Barber stated that it was undisputed that Roe relayed details of the incident to "A.S." the next morning. The text message in question—and pasted into the draft report—does not reference the alleged digital penetration that was at issue in Roe's case and contains statements that contradict Roe's allegations.

355.     Barber's findings of "undisputed fact" with respect to Jane Doe's allegations were also flawed because *inter alia*:

    a.  Barber relied on the statements of witnesses that she knew Jane Doe had coached prior to their interviews as support for the "undisputed" facts.

    b.  Barber ignored inconsistencies in Jane Doe's account of what had occurred. For example, Jane Doe stated that the room was dark but then said Plaintiff was deriving pleasure from looking at her body.

    c.    Barber ignored the statements by Jane Doe's friend and roommate, N.B. and E.M., that on the morning after the alleged incident Jane Doe said she had a consensual encounter with Plaintiff.

    d.    Barber ignored evidence that Jane Doe suddenly alleged that her encounter with Plaintiff involved nonconsensual activity after she learned that Plaintiff slept with another woman on the day after Jane Doe and Plaintiff were together.

    e.    Barber made no reference to the undisputed fact that Jane Doe was out for "revenge" against Plaintiff and engaged in a campaign against Plaintiff to ensure there were "social repercussions" for him, that she said she wanted Plaintiff's name to be attached to her accusations and went so far as to ask a witness where Plaintiff intended to work after graduation. Jane Doe also told a friend that her Title IX complaint was designed to get Plaintiff banned from campus.

    f.    Barber did not include the undisputed fact that Jane Doe filed for a TRO against Plaintiff, that the allegations were unsubstantiated, and the TRO was dismissed.

    g.    Barber did not include the undisputed fact that Jane Doe deleted all of her text messages with Plaintiff except the message that (falsely) accused him of sexual misconduct.

### 4.  Barber Permits Jane Doe to Review and Comment On Evidence Relating to Sue Roe's Case

356.    Though the Code of Student Conduct permitted Barber to redact the investigation report presented to each complainant so that each complainant received information pertaining only to her case, Barber elected not to do so. 2021-2022 Code of Student Conduct, Pt. VI.E, at p. 14.

357.    Instead, each complainant was permitted to review and comment on the other's case as part of responding to the initial investigation report.

358.    Jane Doe submitted extensive comments (nearly five out of six pages) about **Sue Roe's** case and evidence, even though she had **no personal knowledge** about what occurred. Barber appended the comments as evidence to her final report. They should have been excluded as irrelevant and prejudicial.

359.    Jane Doe's comments were, for the most part, a character assassination of Plaintiff rather than an effort to provide legitimate comments to the draft investigation report.

**5.    The Evidence Cast Doubt On the Credibility of the Complainants and Witnesses**

360.    Evidence gathered by Barber during her investigation showed that there were a number of misstatements and inconsistencies in Sue Roe's and Jane Doe's accounts to Barber, apart from the fact that they spent hours together coordinating the details of their stories prior to making Title IX complaints.

a.    **Sue Roe and Jane Doe Connected On Or Around January 28, 2022**

361.    The evidence showed that Jane Doe and Sue Roe knew each other before Jane Doe first went on a date with Plaintiff.

362.    Jane Doe and Sue Roe each told Barber that they first connected with each other on February 8, 2022, after Jane Doe's February 2nd sexual encounter with Plaintiff.

363.    Jane Doe reported to Barber that she first learned who Sue Roe was on February 5, 2022, when her friend, N.B., mentioned Sue Roe in a conversation about Plaintiff.

364.    The evidence gathered during the investigation showed that Sue Roe and Jane Doe knew each other as early as January 28, 2022, before Jane Doe first went out with Plaintiff to the racetrack date party.

365.    But N.B. reported to Barber that, on or about January 28th, N.B "warned" Jane Doe about Plaintiff prior to the racetrack event and referenced Sue Roe's negative opinion of Plaintiff "I've heard bad things about this guy."

366.    N.B. verified that, at that time, Jane Doe expressed a desire to find out the specifics of what happened between Plaintiff and Sue Roe. This desire to learn more about Plaintiff and Sue Roe's experiences further explained Jane Doe's odd question at the racetrack

event, during which she asked Plaintiff "Is there anyone that you're avoiding here?" in the hopes that she would gain information from Plaintiff about Sue Roe's opinion of him.

367.    Neither Jane Doe nor Sue Roe provided evidence of text messages or other forms of messaging between them, which Plaintiff pointed out to Barber as suspicious.

368.    The messages submitted by Jane Doe's friend "N.B." were incomplete and a number of her messages with Jane Doe lacked time stamps.

369.    Jane Doe was given the opportunity to confirm the timestamps of the texts and submit verification of her first correspondence with Sue Roe.

370.    Rather than confirming their alleged timeline, Jane Doe responded by calling Plaintiff's suspicions "Self-validated analysis [that] fails to consider any other point of view than Plaintiff's – a white male college student."

371.    Plaintiff also provided Barber with evidence demonstrating that Jane Doe and Sue Roe connected via Instagram well before Plaintiff's February 2, 2022 sexual encounter with Jane Doe and well before the February 8 date that Sue Roe and Jane Doe provided to Barber.

**b.    Jane Doe Knew About Plaintiff's Subsequent Sexual Encounter**

372.    When interviewed, Jane Doe told Barber that she did not know with whom Plaintiff had sex on the day after his encounter with Jane Doe.

373.    However, text messages submitted to Barber by witnesses indicated otherwise. In texts from February 9, 2022, submitted by Jane Doe's friend K.R., Jane Doe asked "Have you heard anything from the girl that [Plaintiff] got with on Thursday?" Jane Doe proceeded to identify the woman to K.R. by name.

374.    Immediately after her sexual encounter with Plaintiff, Jane Doe told her friends

that she was comfortable with the situation and that it was "fine."

375.    After seeing Plaintiff with the other woman on the night of February 3, 2022, Jane Doe began accusing Plaintiff of sexual misconduct.

### c.    Jane Doe Misrepresented The Nature of Her Relationship With Plaintiff

376.    Jane Doe deleted all the text messages between her and Plaintiff from her phone after she reported Plaintiff to the SAPHE hotline and in advance of her interview with Barber.

377.    Some of the texts Jane Doe deleted, which Plaintiff later provided to Barber, confirmed that Jane Doe had materially lied during her interview with Barber.

378.    In her interview, Jane Doe claimed, multiple times, that the first time she ever had sex with Plaintiff was on February 2, 2022. This was false, as Jane Doe and Plaintiff also had sex on January 29, 2022.

379.    This was proven false by text messages between Jane Doe and Plaintiff on January 30, 2022 and confirmed by N.B.'s testimony who said, "This was not the first time they had had sex" when referencing the February 2nd consensual encounter.

380.    Jane Doe lied about the January 29th consensual sexual encounter to create the narrative that it was "fucked up" when Plaintiff walked her home on February 3, 2022, as though they had not had relations prior to the alleged encounter on February 2, 2022.

381.    There was nothing abnormal about Plaintiff walking her home again the morning after their February 2, 2022 encounter, as it was a normal and usual course of action in the context of their sexual relationship.

382.    Jane Doe also told Barber that on the morning after the alleged assault, she was "trying to slip out without waking him or anything, but I remember he woke up." Jane Doe had

actually texted Plaintiff the night before – the night of their sexual encounter – informing him that she would need to leave early, stating "I just have to leave at like 8:15" and then proceeded to set an alarm for around 8:00am that woke both of them up. However, as Jane Doe had deleted all of her text messages, it was Plaintiff's record of text messages that showed the inconsistency.

### d.  <u>Sue Roe Made Several Inconsistent Statements</u>

383.    Sue Roe alleged that Plaintiff digitally penetrated or touched her vaginal area three times, beginning when she was asleep and after she woke up and said no. Plaintiff denied that this happened.

384.    While Sue Roe told Barber that she told her housemates "Step by step what had happened," no contemporaneous text messages and no witnesses mentioned that Sue Roe told them about the alleged digital penetration. None could confirm this detail.

385.    Sue Roe's contemporaneous text message to Plaintiff stated that she "woke up to [him] trying to get [her] to have sex with [him]," which is very different than what Sue Roe alleged occurred in her Title IX report.

386.    Sue Roe also left out significant context when providing her account of what happened to Barber, including that—as Plaintiff had reported to Barber—Roe became upset with Plaintiff and was crying after the two had consensual sex because Plaintiff stated he might regret it later and Sue Roe had been upset about another person she was seeing rejecting her. Sue Roe's friend A.S. produced contemporaneous text messages with Roe in which Roe told her friend these precise details.

XI.    **Barber's Flawed and Biased Findings and Sanction**

387.    Barber was designated as the sole investigator, decisionmaker and arbiter of the sanctions that were imposed on Plaintiff because Tulane took Plaintiff's case out of the Title IX process.

388.    Despite the removal of Plaintiff's case from the Title IX process, like Zacharda (or perhaps at his or Broussard's direction), Barber cherrypicked Tulane's Title IX procedures so that the conduct process against Plaintiff was more beneficial to the complainants.

389.    Sue Roe and Jane Doe were afforded the protections of the Title IX Regulations but Plaintiff was not.

390.    In accordance with Tulane's Title IX Policy, Barber employed Tulane's Title IX process when drafting the Final Investigation Report, laying out "material" facts that were "undisputed."

391.    Barber also applied the Title IX Regulations to exclude relevant evidence related to the complainants' prior relationships.

392.    In the case of Sue Roe, Plaintiff and other witnesses provided evidence (which Roe failed to mention) that, on the night of her sexual encounter with Plaintiff, Roe was upset over having been rejected by another Tulane student she had been having a sexual relationship with and had been interested in dating.

393.    This relationship was a point of discussion between Plaintiff and Roe prior to engaging in consensual, sexual intercourse on the night in question and, in combination with Plaintiff's statement about potentially regretting having sex with Roe, caused Roe to cry after she and Plaintiff had sex.

394.    Roe admitted this in a text message produced by her friend.

395.    Plaintiff pointed to Roe's emotional state as grounds for her decision to have her roommate wake him up and ask him to leave.

396.    Tulane's Code of Student Conduct allowed Barber to consider a party's "prior sexual history with other parties" to prove "intent" or "motive." *Id.* at p. 14.

397.    Barber rejected the evidence concerning Sue Roe's motives, stating that she could not consider it under "current guidance," referring to the Title IX Regulations. *Id.*

398.    Barber further mischaracterized the evidence as relating to Roe's "disclosure that she had sexual intercourse with a mutual contact prior to" her sexual encounter with Plaintiff when the evidence at issue concerned a) Roe's emotional state and motives at the time she engaged in consensual sex with Plaintiff and immediately thereafter; and b) her failure to disclose to Barber that she was upset after she admittedly engaged in consensual sex with Plaintiff and promptly texted her friend afterwards about being upset about her relationship with the other male student.

399.    Plaintiff provided evidence that Jane Doe engaged in a pattern of making sexual assault and conduct allegations against other men. The Code of Student Conduct allows the investigator to consider pattern evidence and evidence concerning a party's prior sexual history with other parties to prove a material fact or to prove motive. Code of Student Conduct, at p. 14.

400.    Barber disregarded the pattern evidence concerning Jane Doe, improperly applying the Title IX Policy to benefit Jane Doe and discounting Jane Doe's pattern of "casually making sexual assault allegations" as character evidence that could not be considered. Code of Student Conduct, Appendix A, at p. 57.

401.    Barber's findings referenced the fact that Plaintiff "declined to engage in an interview." The Code of Student Conduct does not permit the investigator to draw any inferences

against a student who declines to participate in the student conduct process. *Id.* at pp. 8, 12. On the contrary. "no inference of transgression should be inferred from the manner in which individuals choose to frame their situations to an investigator." *Id.* at 8.

402.    The Title IX Policy, which Barber relied on when beneficial to the complainants, states that no adverse inference may be drawn in reaching a determination regarding responsibility based solely on the individual's absence from the hearing (or their refusal to be cross examined). Code of Student Conduct, at p. 59.

403.    Plaintiff participated in the conduct process by providing written statements and evidence, and written answers to Barber's questions.

404.    Barber made credibility determinations, which were not permitted in the investigation of Major Matters, as set forth in the Code of Student Conduct. *Id.* at pp. 8, 14.

405.    Once again, Barber improperly applied the Title IX Policy rather than Code of Student Conduct. The Title IX Policy permitted the investigator to make credibility determinations in the investigation report, before it was handed off to a separate adjudicator for the live hearing. *Id.* at pp. 17, 57. Here, there was no live hearing.

406.    Barber resolved all credibility issues in favor of the female complainants and against Plaintiff.

407.    Barber found that Roe was credible because her investigation interview was "materially consistent with her written incident report." Barber did not address that a) Roe waited nearly six months to come forward; b) that her contemporaneous statements to friends did not include allegations of digital penetration; or c) that Roe and Jane Doe spent hours together before they lodged Title IX complaints against Plaintiff and gave interviews to Barber.

408.    Barber found that Plaintiff lacked credibility because his written narrative of events contained "nothing about waking up [Roe] or engaging in additional sexual activity during the night at issue." Plaintiff denied that such activity occurred.

409.    Barber also found that Plaintiff's written denial of Roe's allegations "did not allow" for Roe's version of events.

410.    Barber credited Roe and the accounts of all her female witnesses, even though a) none of her witnesses could confirm that Roe said Plaintiff engaged in, or attempted to engage in, nonconsensual digital penetration; b) several learned about Roe's allegations secondhand; and c) many, if not all, of the witnesses were coached by Jane Doe prior to their interviews.

411.    In contrast, Barber did not credit male witnesses who corroborated statements made by Plaintiff. Her findings cited *no male witness's statement*.

412.    Barber found that Plaintiff was "blacked out" during his encounter with Roe. Notably she did not find that Roe was intoxicated.

413.    Despite her erroneous finding that Plaintiff was "blacked out," Barber did not question whether Plaintiff was capable of giving consent when he and Roe had sexual intercourse. There was no finding that Roe was intoxicated.

414.    Barber credited text messages in which Plaintiff expressed confusion over rumors that Roe was unhappy about their sexual encounter as evidence that Plaintiff was intoxicated, even though Sue Roe said that Plaintiff showed no visible signs of intoxication when the two went home together.

415.    Barber read meaning into Plaintiff's text exchanges with female witness, M.V., that was not stated in the messages themselves in order to find that Plaintiff was not credible.

416.     Barber found that Jane Doe's interview was consistent with her written incident report, ignoring the evidence that Jane Doe and Sue Roe had coordinated their reports and spent hours together discussing Plaintiff.

417.     Barber acknowledged that there were discrepancies between Jane Doe's account of what happened with Plaintiff and her "outcry witnesses" but still credited Jane Doe's account as truthful. In doing so, Barber ignored that a) Jane Doe's witnesses noted that Jane Doe was seeking revenge against Plaintiff; b) Jane Doe herself expressed wanting her allegations to be permanently attached to Plaintiff's name; and c) text messages contradicted Jane Doe's assertion that she did not know who Plaintiff slept with on the night after their sexual encounter.

418.     Barber further acknowledged evidence that Jane Doe misrepresented her prior sexual relationship with Plaintiff, falsely asserting that the night of the alleged incident was the first time they had had consensual sex. Barber found that this was not "a large enough deviation to call into question [Jane Doe's] overall credibility."

419.     In contrast, Barber pointed to no inconsistencies in statements Plaintiff made about his sexual encounters with Jane Doe, or his denial of her allegations of nonconsensual sexual contact.

420.     Instead, Barber once again speculated that Plaintiff was too intoxicated to remember events, even though there was no evidence to support this conclusion.

421.     Similar to Roe, Barber did not question whether, if he was intoxicated, Plaintiff was able to affirmatively consent to intercourse with Jane Doe, who reported being sober when she and Plaintiff engaged in consensual sexual intercourse.

70

422.   Because Plaintiff asserted that he did not engage in any sexual activity with Jane Doe after they had consensual sex, Barber found that "there was a gap in information" which called "into question whether [Plaintiff's] narrative was complete."

423.   Rather than weighing the evidence, Barber simply credited Jane Doe's account of what happened and interpreted evidence in the light most favorable to Jane Doe—which was not permitted under the Code of Student Conduct or the Title IX Policy.

424.   Barber found that Plaintiff presented evidence which demonstrated that Sue Roe and Jane Doe misrepresented when they first connected with each other. This supported Plaintiff's assertion that Jane Doe knew Sue Roe prior to going on her first date with Plaintiff at the racetrack and contradicted the complainans' narrative that they came together after Jane Doe's last sexual encounter with Plaintiff. Barber dismissed this evidence as irrelevant and having no impact on their credibility.

425.   Barber found that each complainant's account was "more likely than not truthful and objectively accurate." This is not the standard that applies in student conduct cases, which requires a finding that it is more likely than not that "a rule transgression has occurred." Code of Student Conduct, at p. 14.

426.   The subjective account of each complainant was also not "objectively" accurate, particularly since the evidence revealed inconsistencies and misstatements with respect to each complainant's account.

427.   Though there was no preponderance of evidence that Plaintiff engaged in the alleged sexual misconduct with respect to either complainant, Barber found Plaintiff responsible for "Sexual Contact" and "Sexual Assault." She did not specify which finding applied to which complainant.

428.    Barber's subsequent Notice of Outcome to Plaintiff also failed to specify which finding pertained to which allegation or complainant.

429.    Barber determined that Plaintiff should be expelled.

430.    On May 6, 2022, Plaintiff was expelled, permanently banned from Tulane's campus and his academic transcript was permanently marked with a "notation of expulsion."

431.    Barber's report confirmed Plaintiff's fear that Zacharda's original consolidation of the jointly reported, coordinated complaints of Jane Doe and Sue Roe into one investigation would bias Barber and cause her to bolster one complaint by relying on the other. As stated in Barber's final report:

> While [Plaintiff's] conduct history contains no prior instances of serious misconduct, this investigation has revealed not one but two instances of sexual assault under similar circumstances.

432.    In determining that Plaintiff should be expelled, Barber considered the parties' "impact statements," assuming that Plaintiff's statement—which was submitted ***prior to*** Barber's findings as part of Plaintiff's defense against allegations he vehemently denied—would take responsibility for the conduct in question. Barber stated the following:

a. "In his impact statement, [Plaintiff] describes the impact this investigation has had on him and his family without any discussion of self-improvement or acknowledgment of any missteps."

b. "Without any acknowledgment of misconduct from [Plaintiff], I have no information about whether he would further engage in [preventive work] in order to safely return to the community."

433.    Barber ignored nearly the entirety of Plaintiff's impact statement, which laid out the various ways in which he had taken care of, been supportive of, and maintained healthy friendships with female students at Tulane and how he, and those friendships, were impacted by the false allegations against him.

434. Barber further ignored that the Code of Student Conduct does not express that a respondent's impact statement must discuss accountability—the Code contains no requirements for impact statements at all. *Id.* at p. 15.

435. In contrast, Barber focused on the complainants' emotions and the sanctions which they wished Plaintiff to receive, as reflected in their impact statements.

436. Barber's statements about Plaintiff's reflected Tulane's general approach towards male students accused of conduct violations, that each male accused was presumed to be responsible for the alleged conduct from the time a complaint was received and needed to take responsibility, even if he denied the allegations. *See* Paragraphs 118-132. *See* Code of Conduct, at p. 15.

437. Upon information and belief, Barber conferred with Zacharda and Broussard in reaching her findings that Plaintiff was responsible and determining sanctions, as the Code of Student Conduct permits the investigator to do so. Code of Student Conduct, at p. 14.

**XII.   Plaintiff's Appeal Is Denied**

438. Although Zacharda and Barber each relied on Tulane's Title IX Policy when beneficial to the complainants, Plaintiff was denied the right to appeal Barber's decision on the grounds of bias or a conflict of interest under the same policy. Code of Student Conduct, at p. 20.

439. Instead, Plaintiff's appeal was limited to procedural error "so substantial that it denied [Plaintiff] the right to a fair hearing;" new and significant evidence; or a disproportionate sanction.

440. On May 20, 2022, Plaintiff submitted a thirty-five-page appeal outlining the overwhelming number of procedural errors made by Zacharda and Barber which denied him the right to a fair hearing.

441.    Per the process set forth in the Code of Student Conduct, Zacharda and Broussard reviewed the appeal. *Id.* at 20.

442.    The appeal was also reviewed by an unidentified appeal panel, comprised of three members. *Id.* at p. 19. The Code did not identify the role or responsibilities of any appellate chair.

443.    Per the Code of Student Conduct, the appeal panel presumes that the "decisions were made reasonably and appropriately, unless there is compelling information to the contrary." *Id.* at 20.

444.    Per the Code of Student Conduct, the "appellate panel will transmit via email a written decision generally within ten (10) business days from the date of the submission of all appeal documents." *Id.* at 20.

445.    On June 21, 2022, Avery Pardee, "Acting Appellate Chair," sent Plaintiff a "Notice of Appeal Outcome," which was determined to be "without merit."

446.    Per the Notice, if Plaintiff's appeal was reviewed by a hearing panel, as required by the Code of Student Conduct, the panel only spent one day reviewing Plaintiff's submission and the underlying record.

447.    The ambiguously worded Notice did not make clear who decided the appeal, nor did it provide reasons why the appeal was found to be without merit.

XIII.    **Tulane's Biased Mishandling of Plaintiff's Complaints**

448.    On April 11, 2022, Plaintiff submitted a complaint against Jane Doe for retaliation, harassment and witness intimidation, based on Jane Doe's filing of the baseless Petition for Protection From Abuse (or TRO) in state court and its subsequent dismissal, and Jane Doe's subsequent, defamatory social media campaign against Plaintiff.

449.    At the time that Plaintiff submitted his complaint, Tulane was in possession of evidence that demonstrated that ***Plaintiff's*** complaint was valid and that Jane Doe had asserted false allegations of stalking and intimidation through third parties as a means of bolstering her allegations against Plaintiff in the conduct proceeding against him and to prevent him from speaking with witnesses with information relevant to his defense.

450.    Plaintiff also provided evidence to Tulane that Jane Doe had spread false and defamatory information about Plaintiff via social media and caused two witnesses in the Title IX investigation to cease contact with Plaintiff.

451.    Tulane failed to follow the Code of Student Conduct and Title IX Policy when addressing Plaintiff's complaint.

452.    The Code of Student Conduct prohibited "[f]urnishing false information to the University or to a University official." 2021-2022 Code of Student Conduct, at p. 22.

453.    The Code of Student Conduct also prohibited "[a]cts of retaliation, intimidation, coercion against any person … who is engaged in activity under this Code of Conduct." *Id.* at p. 23.

454.    The Code of Student Conduct also expressly prohibited "harassment in [Tulane's] … educational programs or activities on the basis of ... sex." *Id.* at p. 23.

455.    The Code of Student Conduct further prohibited "harassment, intimidation or cyberbullying." *Id.*

456.    Plaintiff's complaint clearly alleged that Jane Doe engaged in the above-stated misconduct in violation of the Code.

457.    On April 14, 2022, after reviewing Sue Roe's and Jane Doe's initial Title IX reports to Tulane, and the evidence and witness interview statements made available to him as

part of Tulane's investigation into the Roe and Doe complaints, Plaintiff filed a complaint against Sue Roe, Jane Doe and their mutual friend, and witness, N.B.

458.    Plaintiff's complaint stated that Roe, Doe and N.B. violated the Code of Student Conduct by "furnishing false information to the University or a University official" and "coercion against any person … who is engaged in activity under this Code of Conduct, such as … acting as a witness or otherwise participating in the investigation process and Title IX process." Code of Student Conduct, at p. 23.

459.    The complaint was grounded in collusion between Roe, Doe and N.B. to bring false sexual misconduct complaints against Plaintiff, misrepresentations that they made in written statements and to Barber about the timeline in which Roe and Doe first connected with each other, omission of material information from their statements to Barber and coaching witnesses to make specific statements to Barber, including by showing them confidential documents relating to the conduct proceedings against Plaintiff.

460.    Tulane failed to follow either the Code of Student Conduct or the Title IX Policy with respect to Plaintiff's complaints.

461.    According to the Code of Student Conduct "Tulane University will promptly and equitably respond to all reports of discrimination and harassment in order to eliminate prohibited conduct, prevent its recurrence, and address its effects on an individual or the community." *Id.* at p. 35.

462.    According to the Code of Student Conduct, "*Investigations* take place when major transgressions of Tulane University rules may have occurred, which may include matters involving Title IX issues, discrimination against a protected class, and/or matters that may result in expulsion, [or] suspension." *Id.* at p. 7 (emphasis in original).

463. According to the Code of Student Conduct, even "Minor Matters" go through some form of conduct process. *Id.* at p. 8.

464. Under the Title IX Policy, matters involving "unwelcome conduct determined by a reasonable person to be so severe, pervasive and objectively offensive that it denies a person equal access to Tulane's educational program or activity," must be investigated through the Title IX grievance process. *Id.* at p. 41.

465. Under the Title IX Policy, Tulane is required to provide complainants who make a report of sexual harassment under the Title IX Policy with information about making a Formal Complaint. *Id.* at 51.

466. After Plaintiff filed his complaints, the allegations of which fell within the definition of sexual harassment under the Title IX Policy, no one contacted him about filing a Formal Complaint.

467. Tulane provided Plaintiff with no information or resources regarding either of his complaints against Jane Doe.

468. On the contrary, Plaintiff had to repeatedly ask Zacharda about the status of the complaints.

469. On April 21, 2022, in response to an inquiry from Plaintiff, Zacharda stated that an "independent review" was being conducted by Broussard, "Associate General Counsel" and the "Dean of Students."

470. On April 26, 2022, Plaintiff emailed Broussard and Tulane's Associate General Counsel, to provide information about his complaints, including the inequity with which he was being treated as compared to Jane Doe and Sue Roe.

471.     On the same day, the Associate General Counsel informed Plaintiff that he was not involved in Plaintiff's "pending student conduct matter."

472.     Broussard failed to inform Plaintiff of the outcome of her Title IX review, as required by the Title IX Policy. 2021-2022 Code of Student Conduct, at pp. 52-53. Per the Title IX Policy, the "Title IX Coordinator…will provide written notice of the determination as to scope and jurisdiction to the Complainant or Reporting Party, refer that individual to the appropriate resources…and provide reasonably available supportive measures." *Id.* at 53.

473.     On May 3, 2022, Zacharda notified Plaintiff that "the review of your complaints against [Jane Doe] and [Sue Roe] for retaliation, false information and collusion has now been completed." Zacharda made no distinction between the two, separate complaints.

474.     Even though each of Plaintiff's complaints concerned multiple, serious violations of the Code of Student Conduct, sex discrimination and sexual or gender-based harassment that were supported by substantial evidence, Zacharda informed Plaintiff that the complaints fell "outside of our Title IX and major matters processes."

475.     Zacharda next informed Plaintiff that he could not "share the details of the outcome" with Plaintiff, though there was nothing expressly written in the Code of Student Conduct which prohibited the sharing of such information.

476.     In contrast, Jane Doe and Sue Roe were provided with copies of each notice given to Plaintiff, unredacted copies of each report Barber issued and were notified of the outcome and sanctions imposed on Plaintiff.

477.     Zacharda further notified Plaintiff that "to the extent [Plaintiff's] complaints related directly to the sexual misconduct charges against [him], that information was provided to"

Barber "for their consideration in regards to the sexual misconduct charges" against him. Zacharda did not specify what information was shared with Barber.

478.    Zacharda made no reference to Plaintiff's complaint against witness N.B.

479.    On May 5, 2022, Plaintiff requested redacted documentation concerning the outcome of his complaints against Jane Doe and Sue Roe.

480.    On May 9, 2022, Plaintiff asked Zacharda what criteria Tulane used to determine whether a complaint concerned a "major matter" or "minor matter" under the Code of Student Conduct.

481.    On May 10, 2022, Zacharda responded to Plaintiff, limiting "major matters" to those involving "sexual assault or intimate partner violence." The Code of Student Conduct contained a much broader definition of the types of complaints or reports that were "major matters," including discrimination against a protected class and "matters involving Title IX issues," suggesting that the Tulane administrators deliberately narrowed their interpretation of "major matters" so that they would not have to investigate Plaintiff's complaints against Sue Roe, Jane Doe or N.B.

482.    Zacharda refused to provide Plaintiff with any information concerning the outcome of his complaints, whether in redacted form or otherwise. With respect to Tulane's justification of the disclosure of the outcome of complaints against Plaintiff to Sue Roe and Jane Doe, Zacharda relied on the Title IX Regulations, which he had repeatedly asserted did not apply to Plaintiff's disciplinary proceeding. This is yet another example of Tulane's selective use of its policies and procedures to benefit females.

483.    Given the number of misrepresentations Zacharda made to Plaintiff about how his conduct process was handled, and Zacharda's and Broussard's bias against male students, it is

Plaintiff's belief that Tulane took no action regarding his complaints because they did not want to upset Jane Doe or Sue Roe and because, at all times, they operated under the presumption that Plaintiff, a male, had engaged in wrongdoing while the women should be believed.

484.   Barber's findings against Plaintiff in her investigation of the Sue Roe and Jane Doe complaints *confirmed* the basis of Plaintiff's April 14, 2022 complaint, as Barber acknowledged that a) Plaintiff provided evidence that contradicted the timeline presented by Roe and Doe as to when they first met; b) Roe failed to disclose facts about her emotional state after having consensual sex with Plaintiff; c) there were discrepancies between Jane Doe's account of what happened and the accounts of her "outcry" witnesses; and d) other witness interviews "could establish that [Jane Doe] gave inaccurate accounts of other facts, including how many times she and [Plaintiff] had sex prior to the incident" and that "[Jane Doe] lied about being invited to [Plaintiff's] birthday."

485.   When conducting witness interviews, Barber also referenced the fact that at least one witness had been coached.

486.   Despite the substantial evidence supporting Plaintiff's April 14th complaint, Tulane took no action. In the investigation of Sue Roe's and Jane Doe's complaints against Plaintiff, Barber dismissed the evidence as irrelevant, found Plaintiff responsible for sexual assault and decided that he should be expelled.

487.   On May 12, 2022, after his first two complaints went nowhere, Plaintiff filed a Title IX/Sexual Misconduct report against Sue Roe and Jane Doe through Tulane's online reporting system, alleging sexual harassment under Title IX.

488.   Tulane took no action regarding the complaint, and Zacharda informed Plaintiff that it fell outside the scope of the Title IX Regulations.

XIV. **Plaintiff's Damages**

489.    As a direct and proximate result of Tulane's discrimination against Plaintiff on the basis of sex, myriad violations of its own policies and procedures and arbitrary and capricious conduct, Plaintiff's wrongful expulsion is now a permanent part of Plaintiff's education records.

490.    Plaintiff will be obligated to disclose this finding and consent to the release of his education and disciplinary records to future educational institutions and certain employers, substantially limiting his ability to gain acceptance to a high caliber (or any) graduate school or law school or obtain lucrative employment in his chosen field.

491.    Tulane's affirmance of Sue Roe's and Jane Doe's false allegations paints Plaintiff as a sexual predator, wiping out a lifetime of hard work towards his reputation, education and future career.

492.    Due to Tulane's biased and unlawful conduct, Plaintiff was subjected to an investigation that was fundamentally unfair, wherein he was presumed guilty as a male accused and Sue Roe and Jane Doe were presumed credible as female accusers. The entire process was tainted against Plaintiff in direct contravention of Tulane's stated policies and promises to students.

493.    Tulane further discriminated against Plaintiff as a male complainant by failing to follow its own policy and procedures in order to benefit Jane Doe, Sue Roe and N.B. as female respondents.

**COUNT I**
**Violation of Title IX of the Education Amendments of 1972**

494.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

495. Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

496. Title IX of the Education Amendments of 1972 applies to all private educational institutions that receive federal funding, including Defendant Tulane.

497. Tulane receives federal funding, including in the form of federal student loans given to students, and is thus subject to the provisions of Title IX.

498. Title IX is enforceable through a private right of action. *See Overdam v. Texas A&M Univ.*, 43 F.4th 522, 527 (5th Cir. 2022) (applying *Purdue* and *Yusef* to ask overarching question of whether the alleged facts raise plausible inference that university discriminated against the plaintiff on basis of sex); *Doe v. Texas Christian Univ.*, No. 4:22-cv-00297, 2022 WL 17631668, at * 2 (N.D. Tex. Dec. 13, 2022) (In accordance with *Overdam* Title IX claim need not fit within precise theoretical framework in order to be actionable).

499. In the context of university disciplinary proceedings, sex discrimination in violation of Title IX may be evidenced by (i) myriad procedural flaws and violations of a university's own policies, including the consolidation of complaints, and (ii) statements by key university officials tending to show the influence of gender as a possible motivating factor in a disciplinary decision. *Texas Christian Univ.*, 2022 WL 17631668, at ** 2-3. *See also Doe v. Texas Christian Univ.*, 601 F. Supp. 3d 78, 86-93 (N.D. Tex. 2022).

500. The manner in which a university responds to pressure from the student body to take a more aggressive stance against male students accused of sexual misconduct can also give

rise to an inference of gender bias. *See Norris v. Univ. of Colo.*, *Boulder*, 362 F. Supp. 3d. 1013-1015 (D. Colo. 2019).

501.    Beginning in 2016 and continuing through February 2022, when Plaintiff was falsely accused of sexual misconduct, Tulane implemented campus wide trainings, policies and procedures which were aimed at eradicating "rape culture," and protecting female students from male students, whom the University categorized as sexual predators.

502.    Immediately prior to Plaintiff's student conduct proceedings, female students started an Instagram account which "outed" male students as sexual predators and, when the site was taken down, hundreds of students, predominantly female, waged a protest in which they demanded that Tulane expel male "rapists" and repeat offenders. At the time, Tulane's undergraduate population was 61% female.

503.    Tulane further implemented training programs to eradicate sexual violence on campus by putting an end to "toxic masculinity." Men's education and engagement was the primary focus of Tulane's response to sexual violence on campus.

504.    Tulane adopted policies and procedures grounded in the idea that male students who adhered to more traditional views of masculinity had the propensity to harm women, display aggressive behavior and commit acts of sexual violence.

505.    The administrators involved in Plaintiff's student conduct process fully embraced this view of toxic and aggressive male behavior.

506.    Tulane's student conduct process is centered around "survivors" and puts the accused in the position of taking responsibility for acts they did not commit in order to fare better in the conduct process.

507.    Tulane has no respondent-specific services for students accused of sexual misconduct.

508.    Tulane rejected application of the Title IX Regulations, which offered enhanced due process protections for the accused, in all cases of alleged sexual misconduct and, instead, upon information and belief, pushed the majority of its sexual assault cases involving male respondents into the standard student conduct process, which employs a single investigator model that is prohibited under the Title IX Regulations.

509.    Tulane does not publish data concerning the gender makeup of the students that are subject to discipline for violations of the University's Code of Student Conduct and Title IX Policy. Given Tulane's adoption of policies and practices that center around male students as sexual predators, it is Plaintiff's belief that students who identify as female and are accused of sexual misconduct are not subject to the same disciplinary process as male students accused of sexual misconduct and, if they are, the female accused receive less severe sanctions.

510.    Broussard, the Title IX Coordinator that oversaw Plaintiff's student conduct process, advised Barber with respect to the investigation of the Sue Roe and Jane Doe complaints, and reviewed Barber's investigation report expressed the following gender-biased views:

    a.   Broussard viewed gender equality through a feminist lens.

    b.   Men who embrace more "stereotypical" gender roles are more likely to commit acts of sexual violence.

    c.   Being a white, cisgender man "carries privilege."

    d.   She hoped that "survivors" would find "other outlets to share their stories that are healing and empowering after the loss of @boysbewaretulane."

511.    Zacharda, who oversaw Plaintiff's conduct process with Broussard, made determinations about interim measures and the manner in which the investigation would proceed,

and advised Barber in regard to the investigation, findings and sanction against Plaintiff, expressed the following views:

    a.  Male or "cis male" students tend be involved in serious conduct cases involving "violence, aggression, [and] anger."

    b.  Male students accused of misconduct are responsible for the conduct of which they are accused and the investigator should view the context of the behavior "in the realm of masculinity" and whether the student was "influenced by hypermasculine or toxic masculinity culture."

    c.  When he is working with male students, Zacharda looks at how issues of masculinity have impacted their choices and decisions.

    d.  Sanctions need to match what will have the most impact for the individual being accused.

512.   Shortly before Plaintiff's conduct proceeding, Zacharda received training on "Myths and Facts about Acquaintance Sexual Assault" which employed male and female stereotypes, used examples in which men are rapists, and described rapists on college campuses as repeat offenders. The training further stated that it is a "myth" that "women lie about being raped to … get revenge on a guy."

513.   Prior to her investigation of the Sue Roe and Jane Doe complaints, Barber participated in Title IX investigator training which:

    a.  discussed sexual assault using gender stereotypes;

    b.  relied on faulty statistics concerning the number of college women who experience sexual assault;

    c.  suggested, based on "Prevalence Data," that most male college students are serial rapists;

    d.  advised that inconsistencies in statements of sexual assault victims should not be used to determine credibility due to trauma.

514.    Immediately prior to investigating the allegations against Plaintiff, Barber participated in a training course which addressed the "brain-based experiences, behaviors and memory characteristics of sexual assault."

515.    Gender bias can be inferred from the following procedural flaws in the conduct process that led to Plaintiff's wrongful expulsion from Tulane:

a.    Prior to holding a Procedural Review meeting with Plaintiff, Zacharda conducted a joint Procedural Review meeting with Sue Roe and Jane Doe.

b.    Zacharda misrepresented to Plaintiff that no investigation had been commenced, even though he, in consultation with Broussard, had already consolidated the Roe and Doe complaints and Barber had interviewed the complainants.

c.    The complaints did not meet the requirements for consolidation under Tulane's Title IX Policy or the Code of Student Conduct.

d.    Zacharda purposefully misrepresented and withheld information to deprive Plaintiff of a fair opportunity to object to Barber's role as investigator because he did not disclose to Plaintiff that the complaints against him had been consolidated and assigned to a single investigator.

e.    Zacharda relied on the Title IX Policy as the basis for consolidating the complaints, which was favorable to the complainants, then he, in consultation with Broussard, denied Plaintiff the right to a live hearing under the Title IX Policy.

f.    Zacharda provided Plaintiff with several notices and resource materials that referred to a live hearing, then denied that Plaintiff was entitled to a hearing because the Title IX Policy and Title IX Regulations did not apply.

g.    Broussard was required to conduct a review of the Sue Roe and Jane Doe complaints and determine whether they should go through the Title IX grievance process. She was further required to give Plaintiff written notice of her determination. She did not provide Plaintiff with this required information.

h.    Before anyone spoke with Plaintiff about the Roe and Doe allegations, he was banned from campus and participation in Tulane-sponsored events and activities, even though there was no evidence that he posed an immediate threat and he had no student conduct record.

i.    In imposing the campus ban, Zacharda, and potentially Broussard, followed no specific, written policy.

516.    Gender bias can also be inferred from the way Barber investigated the complaints against Plaintiff:

a.  Barber's questioning of the complainants evidenced her presumption that Plaintiff was guilty.

b.  Barber failed to ask critical follow up questions about important facts relayed by each complainant, including that the complainants had spent hours together discussing Plaintiff prior to filing their complaints.

c.  Barber likewise failed to ask critical follow up questions of the witnesses that she interviewed.

d.  Barber suggested facts to the complainants about Plaintiff's behavior, such as his level of intoxication.

e.  Barber asked several female witnesses how they believed Plaintiff's conduct fit within the definitions of sexual misconduct in the Code of Student Conduct. Male witnesses were not asked whether they believed the alleged conduct violated the Code.

f.  Barber elected not to ask a male witness about an incident in which Jane Doe accused him of a conduct violation, leading to a temporary suspension, after he broke up with her and did not invite Jane Doe to his birthday party.

g.  Barber ignored that nearly every witness was coached by Jane Doe prior to giving his or her statement or before supplementing his or her statement.

h.  Prior to Plaintiff's submission of evidence, Barber issued an initial investigation report which credited the complainants' accounts of what happened as "undisputed."

i.  The "undisputed" facts posited by Barber were readily disputed by the evidence cited in her report.

j.  Even though the Title IX Policy was inapplicable to Plaintiff's student conduct proceeding, Barber selectively applied the Title IX Policy and Title IX Regulations when it would benefit Sue Roe and Jane Doe.

k.  Barber included Jane Doe's dismissed TRO in her initial and final investigation reports to bolster Jane Doe's complaint, even though Barber knew the TRO was meritless.

    l.   Barber drew incorrect and improper conclusions about the Sue Roe and Jane Doe complaints from the inception of the investigation, without giving Plaintiff an opportunity to be heard, and penalized him for his perceived lack of participation.

    m.   Barber elected not to redact the copies of her investigation report that were provided to Sue Roe and Jane Doe and permitted Jane Doe to submit extensive comments about Jane Doe's allegations as "evidence," even though Jane Doe had no personal knowledge about Roe's interactions with Plaintiff.

517.    Gender bias can also be inferred from Barber's findings and conclusions in determining that Plaintiff was responsible for sexual assault:

    a.   Barber applied the purportedly ***inapplicable*** Title IX Policy to conclude that she could not consider key evidence related to the complainants' prior relationships, patterns of behavior and emotional state.

    b.   Barber excused each complainants' failure to disclose crucial facts about their interactions with Plaintiff as irrelevant.

    c.   Barber penalized Plaintiff for declining to engage in an in-person interview, made improper credibility determinations and resolved all credibility issues in the complainants' favor.

    d.   Barber credited the statements of all the female witnesses, despite the fact that they had been coached, and did not credit the statements of the male witnesses.

    e.   Barber dismissed inconsistencies, misrepresentations and omissions in the complainants' statements as irrelevant.

    f.   Barber speculated that Plaintiff was intoxicated during his encounters with Jane Doe and Sue Roe which accounted for "gaps" in his statements. There were no gaps in Plaintiff's statements—Plaintiff denied the conduct that was alleged and Barber took issue with that.

    g.   Rather than weighing all the evidence, Barber simply credited the women's accounts.

    h.   Barber did not apply the preponderance of the evidence standard.

    i.   Barber criticized Plaintiff for not taking responsibility for the alleged misconduct in his impact statement, which he was required to submit during the investigation. In contrast, she focused on the emotions expressed in the complainants' statements.

518.    Additional evidence of gender bias is found in Tulane's mishandling of the complaints that Plaintiff filed against Jane Doe, Sue Roe and N.B.:

a.  Broussard failed to inform Plaintiff of the outcome of any Title IX review that she conducted or give him instructions on how to file a Formal Complaint.

b.  Tulane selectively applied its Code of Student Conduct and the Title IX Regulations to benefit the female respondents.

c.  Tulane declined to investigate Plaintiff's complaints as "major matters," by employing an overly narrow definition than the definition set forth in the Code of Student Conduct.

d.  Zacharda misrepresented to Plaintiff that Tulane's Associate General Counsel was reviewing Plaintiff's complaints.

e.  Zacharda selectively shared the evidence supporting Plaintiff's complaints with Barber for use in her investigation of the Roe and Doe complaints against Plaintiff.

f.  Tulane ignored the substantial evidence supporting his claims of retaliation and collusion and, upon information and belief, took no action—formal or informal—against Jane Doe or Sue Roe. Tulane would not share the outcome of his complaints with Plaintiff, even in redacted form.

g.  Tulane operated under the presumption that Plaintiff engaged in wrongdoing and that the complainants were to be believed, even though Barber's findings in the investigation of the Sue Roe and Jane Doe complaints against Plaintiff confirmed the basis of Plaintiff's April 14, 2022 complaint.

519.     Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and punished severely for it.

520.     As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

521.     As a result of Tulane's violation of Title IX, which resulted in an erroneous and unduly severe and unwarranted sanction which continues to injure Plaintiff's reputation and right to continue his education and future employment, an injunction should issue directing Tulane to (i) reverse the outcome and findings regarding Sue Roe and Jane Doe; (ii) expunge Plaintiff's disciplinary record; (iii) remove the notation of expulsion from Plaintiff's transcript; (iv) remove any record of the investigation, findings and sanction from Plaintiff's education records and any other records kept at the University, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any records concerning the complaints.

522.     As a result of the foregoing, Plaintiff is also entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT II
### State Law-Breach of Contract

523.     Plaintiff repeats and re-alleges each and every allegation set forth in Paragraphs 1-493, above as if fully set forth herein.

524.    Under Louisiana law, the basic legal relation between a student and a private university is contractual in nature and the publications given to the student are part of the terms of that contract. *See I.F. v. Administrators of the Tulane Educ. Fund*, 131 So. 3d 491, 498 (2013).

525.    The disciplinary decisions of a private university may be reviewed for arbitrary and capricious action because the power of private institutions is not absolute and they may not cavalierly disregard or ignore the due process safeguards set forth in their own policies. *See I.F.*, 131 So. 3d at 499. A private university's failure to adhere to its own binding procedures can make a resulting decision arbitrary and capricious. *Id.*

526.    The following is a non-exhaustive list of the ways in which Tulane violated Plaintiff's contractual right to due process by failing to follow its own binding procedures with respect to the Sue Roe and Jane Doe complaints against Plaintiff:

    a.  Tulane either did not conduct, or failed to provide Plaintiff with the requisite notice that it did conduct, a gatekeeping of Sue Roe's and Jane Doe's complaints under the Title IX Policy. 2021-2022 Code of Student Conduct, Appendix A, Pt. VII.

    b.  Tulane did not inform Plaintiff of the outcome of the gatekeeping evaluation or give him a chance to appeal the determination. *Id.* Pt. VIII.

    c.  Tulane informed Plaintiff in his Notice of Procedural Review Meeting, Notice of Investigation, a document called "Investigation Procedural Protections" and via statements made to Plaintiff by Zacharda that Plaintiff had the right to a live hearing.

    d.  Zacharda subsequently informed Plaintiff that the Title IX Policy did not apply and Plaintiff would not have a live hearing with a right of cross examination, as provided for in the Title IX Policy.

    e.  Tulane deprived Plaintiff of his right to object to Barber as investigator at, or after, Plaintiff's Procedural Review meeting because Zacharda misrepresented to Plaintiff that the investigation had not yet been commenced. *See* Notice of Procedural Review.

    f.  Tulane violated the Code of Student Conduct and the Title IX Policy when Zacharda consolidated the Sue Roe and Jane Doe complaints for investigation by Barber. 2021-2022 Code of Student Conduct, at pp. 13, 51.

g.  Tulane violated the Code of Student Conduct when imposing a campus ban on Plaintiff and when notifying Plaintiff of same. *Id.* at p. 31, 51.

h.  Tulane investigated the Sue Roe and Jane Doe complaints under a presumption of guilt, denying Plaintiff "a neutral and fair investigation with no presumptions of wrongdoing." *Id.* at pp. 8.

i.  Tulane failed to provide "a fair and reliable gathering of the facts by a trained and impartial investigator." *Id.* at p. 12.

j.  Tulane drew an "inference of transgression" against Plaintiff based on his election to submit a written statement and respond to written questions after he was denied the right to a live hearing. *Id.* at pp. 8, 12.

k.  Tulane issued a one-sided, biased initial investigation report, without Plaintiff's statements or evidence, prior to the conclusion of the investigation which did not comply with the format required by the Code of Student Conduct. *Id.* at p. 14.

l.  Tulane applied the Title IX Policy as opposed to the requisite Code of Student Conduct when it was beneficial to complainants in the investigation and when determining responsibility. *Id.* at pp. 14, 17, 57.

m.  Tulane applied the Title IX Regulations rather than the Code of Student Conduct to exclude consideration of relevant evidence and benefit the complainants. *Id.* at p. 14.

n.  Tulane did not apply the preponderance of the evidence standard set forth in the Code of Student Conduct when determining that Plaintiff was responsible for sexual assault. *Id.* at 10, 14.

o.  Tulane failed to follow its written procedures when reviewing and determining the outcome of Plaintiff's appeal. *Id.* at p. 19.

527.   The following is a non-exhaustive list of the ways in which Tulane violated Plaintiff's contractual right to due process by failing to follow its own binding procedures with respect to the April 11, April 14, 2022 and May 12, 2022 complaints filed by Plaintiff against Jane Doe, Sue Roe and N.B.:

a.  Tulane failed to promptly and equitably respond to Plaintiff's "reports of discrimination and harassment." Code of Student Conduct, p. 35.

b.  Tulane failed to open an investigation of the complaints as "major matters." *Id.* at p. 7.

c.  Tulane adopted an overly narrow view of "major matter" to avoid taking action against Sue Roe, Jane Doe and N.B. *Id.* at 7.

d.  Tulane failed to effect any process under the "minor matter" provisions of the Code of Student Conduct. *Id.* at p. 8.

e.  Tulane failed to provide Plaintiff with information about making a Formal Complaint. *Id.* at 51.

f.  Tulane failed to provide Plaintiff with information concerning available resources to students who file complaints. *Id.* at 31, 48-50, 53.

g.  Tulane failed to conduct a Title IX review or, if such review was conducted, failed to inform Plaintiff of the determination in writing. *Id.* at 53.

h.  Tulane took no action with respect to Plaintiff's May 12, 2022 complaint. *Id.* at pp. 7-18, 35, 51-53.

528.  Tulane acted in bad faith, thereby breaching the covenant of good faith and fair dealing implied in its contract with Plaintiff, by materially deviating from its conduct process, following unwritten rules and applying inapplicable policies, to Plaintiff's detriment and in conformity with Tulane's policy of aggressively pursuing discipline against male students accused of sexual misconduct.

529.  Tulane's findings of responsibility and decision to expel Plaintiff were arbitrary and capricious because Tulane failed to follow its own binding procedures, substantially and materially deviated from its procedures such that it was difficult for Plaintiff to discern precisely

which procedures were being applied to his student conduct process, and Tulane's decisions were made in disregard of the evidence or the proper weight thereof.

530.    Tulane's failure to act with respect to Plaintiff's complaints against Sue Roe, Jane Doe and N.B. was also arbitrary and capricious because Tulane failed to follow its own binding procedures, substantially and materially deviated from its procedures in order to benefit Sue Roe, Jane Doe and N.B. as female respondents and disregarded the substantial weight of evidence that supported Plaintiff's allegations.

531.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff was wrongly found responsible for sexual assault and severely sanctioned, and thus sustained damages, including, but not limited to, emotional distress, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

532.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus pre- and post-judgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Tulane to: (i) reverse the outcome and findings regarding Sue Roe and Jane Doe; (ii) expunge Plaintiff's disciplinary record; (iii) remove the notation of expulsion from Plaintiff's transcript; (iv) remove any record of the investigation, findings and sanction from Plaintiff's education records and any other records kept at the University, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any records concerning the complaints.

**PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant as follows:

(i)  On the first count for Violation of Title IX of the Education Amendments of 1972, a judgment against Tulane awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Tulane to: (i) reverse the outcome and findings regarding Sue Roe and Jane Doe; (ii) expunge Plaintiff's disciplinary record; (iii) remove the notation of expulsion from Plaintiff's transcript; (iv) remove any record of the investigation, findings and sanction from Plaintiff's education records and any other records kept at the University, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any records concerning the complaints;

(ii)  On the second cause of action for Breach of Contract, a judgment against Tulane awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Tulane to: (i) reverse the outcome and findings regarding Sue Roe and Jane Doe; (ii) expunge Plaintiff's disciplinary record; (iii) remove the notation of expulsion from Plaintiff's transcript; (iv) remove any record of the investigation, findings and sanction from Plaintiff's education records and any other records kept at the University, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any records concerning the complaints; and

(iii) Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Dated:    April 24, 2023

Respectfully submitted,

/s/ Alex T. Robertson
Brian P. Marcelle (La. Bar No. 25156)
Alex T. Robertson (La. Bar No. 37285)
Jacques C. Mestayer (La. Bar. No. 37230)
**Marcelle Robertson Mestayer LLC**
650 Poydras St. Ste 2720
New Orleans, LA 70130
Phone: (504)910-6220
Fax:     (504)910-6800
brian@mrmlaw.com
alex@mrmlaw.com
jacques@mrmlaw.com
*Local Counsel for Plaintiff*

*- And -*

/s/ Andrew T. Miltenberg
Andrew T. Miltenberg (*pro hac vice* admission pending)
Kara L. Gorycki (*pro hac vice* admission pending)
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500 (telephone)
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com
*Attorneys for Plaintiff*

**SERVICE TO BE ACCOMPLISHED BY WAIVER**